229 N.J. Super. 405 (1988)
551 A.2d 1009
SANDRA GOLDEN, PLAINTIFF-APPELLANT,
v.
NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 1988.
Decided December 23, 1988.
*406 Before Judges PRESSLER, O'BRIEN and SCALERA.
*407 Leonard S. Needle argued the cause for appellant (Zager, Fuchs, Leckstein, Kauff & Needle, attorneys, Leonard S. Needle on the brief).
William S. Tucker argued the cause for respondent (Stryker, Tams & Dill, attorneys, Wilma M. Kenny, on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
In this suit for recovery of the proceeds of a life insurance policy with a counterclaim for rescission of the policy, plaintiff appeals from a summary judgment in favor of defendant. We reverse and remand for trial.
Plaintiff is the widow and beneficiary under a life insurance policy in the amount of $300,000 issued by defendant Northwestern Mutual Life Insurance Co. (NML) on the life of her husband Allen Golden (the insured) who died on July 8, 1985 at age 46 of "cardiac arrest due to or as a consequence of metastatic renal cell carcinoma."
The insured had applied for the policy through Howard Tepper (Tepper), an agent for defendant, on May 16, 1984. On May 17, 1984, at his home, the insured underwent a perfunctory medical examination by Dr. David M. Glass, sent by NML, who filled out the appropriate section of the application form. The insured had disclosed in the application that he had been rated on a previous policy by Equitable Life Insurance Company because of an erroneous diagnosis of pulmonary embolism contained in the records of a hospital where he had been admitted for a bronchial infection. The section of the application filled out by Dr. Glass revealed that the insured had a family history of heart disease and that his father died at age 44, and his mother at age 61, of a "m.i.," presumably myocardial infarction. The insured identified his personal physician as Dr. Jacob Lewis, whom he had last seen two years previously for a cold.
*408 On this appeal, we are concerned with the insured's answers to certain questions as recorded by Dr. Glass in the application form. The following answers were given to the pertinent subdivisions of question # 33.
33. Have you ever been treated for or ever had any indication of:
* * * * * * * *
F. Sugar, albumin, blood in urine; venereal disease, stone or other disorder of kidney, bladder, prostate, or reproduction organs?
 Yes X No
G. Diabetes; thyroid or other endocrine disorders?
 Yes No X
* * * * * * * *
J. Disorder of skin, lymph glands, cyst, tumor or cancer?
 Yes X No
The insured gave the following answers to the pertinent subdivisions under question # 34:
34. Other than above, have you within the past five years:
A. Had any physician or practitioner examine, advise or treat you?
 Yes X No
For common cold two years ago.
* * * * * * * *
C. Had EKG, X-ray, other test.
 Yes No X
D. Been advised to have any test, hospitalization, or surgery which was not completed.
 Yes No X
Under a remarks section Dr. Glass gave the following information by way of explanation to the "yes" answers:
33.
F. Congenital kidney malformation, one kidney is larger than the other pt. claims that smaller kidney doesn't function. No hx of recurrent kidney infections.
Pilonidal cyst excised 32 years ago. No recurrence.[1]
*409 The examination revealed that the insured was six feet tall and weighed 227 pounds. Three blood pressure readings were submitted, 124/82; 122/84; 122/82, apparently in accordance with the request for three readings where "there is a history of elevated blood pressure." A urinalysis was also made. The insured's signature appears below the following language:
I declare that my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief. Statements in this application are representations and not warranties.[2] [Footnote supplied.]
After receipt of the application NML sent an attending physician statement to Dr. Jacob Lewis who responded on May 24, 1984 that he had treated the insured for "occasional upper respiratory infections" but that he had not treated him for several years. NML then made inquiry of the Medical Information Bureau (MIB)[3] as to the insured's prior health history. The coded response, 901SZD, revealed suspected questionable, or doubtful diabetes mellitus within the last six to ten years from information obtained from an attending physician, surgeon, hospital, sanitarium or clinic.
Upon receipt of this information NML again wrote to Dr. Lewis on June 19, 1984 requesting the following additional information:
Your patient relates a history of congenital kidney malformation. Are you aware of the details of this history, including diagnosis and current condition? He also relates a history of bronchial infection versus pulmonary embolism history. Can you elaborate on this history? Has Mr. Golden ever been diagnosed a diabetic or had a blood sugar problem? If so, when? What are the results of all blood sugars? May we have all blood pressure and dates *410 recorded? May we have the range of blood pressure readings taken in the last several years? If treatment was given for blood pressure control, we will need the details including the pretreatment blood pressure levels, the name and dosage of the drug, the date administration was started, and if discontinued, the date stopped. We are enclosing a copy of your original report for your reference.
Dr. Lewis' response was in longhand on the bottom of the letter from NML and stated: "I have no information on any of the above requests  I have never treated this patient for any of the above ailments." This response was received by NML on July 17, 1984.
Attached to plaintiff's brief in opposition to defendant's motion for summary judgment are forms entitled "Application Worksheets New Business Departments" and "Supplemental to Application Work Sheet (Underwriting)." In the latter form appears the following two entries:
9/5 Pat  We are unable to obtain details of medical hx codes outstanding. Also hx of `congenital kidney malformation' with constant albumin. Suggest facultative reinsurance.[4] [Footnote supplied.]
9/6 Agree s codes, c build, fam. hx., kidney abn. c albumin to fac. reinsurer.
Meanwhile on July 7, 1984, NML requested MIB to supply the details of the code. MIB responded to that inquiry on September 6, 1984 with a copy of a letter dated September 8, 1981 from Hyman M. Finkelstein, M.D. to Equitable Life Insurance Company. In that letter the doctor notes that as a result of blood in his urine the insured was found to have "a double ureter and pelvis with abnormalities on the left. He also had a small abnormally shaped kidney on the right." It was also noted that the insured had come in to the doctor for minor complaints between 1961 and 1966, primarily obesity. He returned to the doctor in January 1971 with information that uric acid had been discovered in his blood for which he had medication. The doctor then related the following information:

*411 He had been told also that he was a potential diabetic. On examination his height was 71 1/2 inches, weight 238 pounds, blood pressure 140/100. Glucose tolerance test revealed the following: fasting 95, 1/2 hour 135, 1 hour 153, 2 hour 116. His urine was negative each time....
After receipt of this information NML decided to issue the policy at a standard premium with participation of a reinsurance company.[5] It was issued with a back-issue date of August 16, 1984, with an escalating premium beginning at $4,076 for the first year and increasing to $9,584 in the fifth year, continuing for the next 40 years. The insured was informed by letter from NML dated September 28, 1984:
We have issued your insurance in the premium classification applied for. We have confirmed that this classification, which takes into account the current weight and the urine findings of proteinuria, is the most favorable classification available. The Premium Waiver Benefit is not available.
After the insured's death, which occurred within the two-year contestability period of the policy (N.J.S.A. 17B:25-4), NML conducted an investigation as to the circumstances of his death. While the details of that investigation are not contained in the record, NML discovered for the first time that the insured had been examined and treated by a Dr. Robert Sioss (Dr. Sioss).
In a letter dated August 13, 1985 to Equifax Services, Inc., Dr. Sioss disclosed that the insured had first come to his office in June 1982. At that time the history revealed that diabetes mellitus had been noted one-and-one-half years before his visit (which would have been in January 1981) for which he took an oral hypoglycemic agent for four months. On examination his weight was 258 pounds and his blood pressure 125/84. A blood test revealed a glucose of 349. At that time Dr. Sioss assessed the insured's main problem as "uncontrolled type II diabetes mellitus secondary to his massive obesity." The doctor prescribed Tolinase, an oral hypoglycemic medication to reduce glucose. He recommended that a fasting blood sugar be performed in 10 to 14 days.
*412 The insured did not return to Dr. Sioss' office until January 1984, 19 months later. On that visit the insured reported that he had not taken the medication since his last visit and whenever he tested his urine he detected a three to four plus glucose. His weight was reduced to 231 pounds because of dieting, but he still complained of thirst and excessive urination. A fasting blood sugar done at that time revealed a glucose of 276 and he was again prescribed Tolinase. Repeat blood sugars performed thereafter produced readings of 118 and then 96, and the medication was decreased. He was scheduled for a further blood sugar in four weeks. Once more the insured failed to follow up and did not return to Dr Sioss' office until January 1985.[6]
In an affidavit Dr. Sioss stated he had diagnosed the insured as having "uncontrolled type II diabetes mellitus" as a result of his examination in June 1982. In the next paragraph of that affidavit he said:
4. I informed Mr. Golden that I had diagnosed him as being a noninsulin dependent diabetic and prescribed oral medication to control his diabetes.
5. Billing statements submitted by my office to Allen Golden contained the information that his diagnosis was noninsulin dependent diabetes.
Although paragraph 4. of the affidavit does not indicate when the doctor informed the insured of his diagnosis, a bill rendered to the insured on June 1, 1982 contained a diagnosis, "noninsulin dependent diabetes melitis, obesity." A second bill on January 12, 1984 contained the diagnosis "type II diabetes mellitus," another bill on January 24, 1984 contained the diagnosis "diabetes," and two other bills dated February 15, 1984 and March 29, 1984 for blood chemistries contained a diagnosis "type II diabetes mellitus."
Defendant's initial motion for summary judgment was denied by the trial judge who concluded there were questions of fact *413 for decision by the jury.[7] On reconsideration the trial judge reversed his prior conclusion and granted summary judgment to defendant by order dated March 31, 1988, relying upon Gallagher v. New England Mutual Life Ins. Co. of Boston, 19 N.J. 14 (1955). Plaintiff appeals and we now reverse.
Summary judgment is a means for the efficient disposition of a cause of action where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. R. 4:46-2. If, after drawing all inferences of doubt against the movant, a court finds there is no genuine issue of material fact, it should enter summary judgment. Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 65 (1980). In a motion for summary judgment the moving papers and pleadings are to be considered in a light most favorable to the party opposing the motion, all doubts being resolved against the movant. See Ruvolo v. American Cas. Co., 39 N.J. 490, 499 (1963). The standards of decision governing the grant or denial of a summary judgment emphasize that a party opposing a motion is not to be denied a trial unless the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact. At the same time, the standards are to be applied with discriminating care so as not to defeat a summary judgment if the movant is justly entitled to one. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74 (1954).
Life insurance policies may be rescinded based upon equitable fraud as well as legal fraud, even after the death of the insured. However, an action for rescission based on equitable fraud must be commenced prior to the incontestability clause in the policy taking effect as mandated by N.J.S.A. *414 17B:25-4. Formosa v. Equitable Life Assurance Society, 166 N.J. Super. 8, 13 (App.Div.), certif. den. 81 N.J. 53 (1979). While an insurance policy may be declared invalid and ordered rescinded on the ground of equitable fraud, based on a misrepresentation of a material fact even though innocently made, the application of this rule is not as encompassing as merely stating it might suggest. Id. at 15, where we continued:
The rule is applied rather strictly to objective questions in an application for insurance, the answers to which must be within the applicant's knowledge, such as whether the applicant has been examined or treated by a physician. However, the rule does not apply to the same extent in dealing with subjective questions, such as what is the state of the applicant's health or whether the applicant has or has had a specified disease or illness. With respect to subjective questions, our courts have held that such questions seek to probe the applicant's state of mind, and if a negative answer is a correct statement of the knowledge and belief it is not a misrepresentation, and thus does not constitute equitable fraud. [Citations omitted.]
In Gallagher, supra, the Supreme Court noted 19 N.J. at pp. 20-21:
The prior medical history of an applicant is naturally and logically a most material matter to a life insurance company which has been asked to underwrite a death risk, and the working rule is that inquiries propounded in the application form, and the truthfulness and completeness of answers thereto touching the physical condition and pathological history of the applicant, are material to the risk as a matter of law and such materiality is not the subject of a finding of fact by a jury.
The insurance company customarily relies on the truthfulness of the insured's rendition of his medical history. It is physically and economically impossible for an insurer to give every potential insured an elaborate medical examination which will disclose the less obvious defects in his health. Equitable Life Assur. Soc. v. New Horizons, Inc., 28 N.J. 307, 312-313 (1958).
Applying those principles to this case, we conclude that, whereas the subdivisions to question 33 may be considered subjective questions in part, clearly question 34 was an objective question. The insured's answers to that question were apparently false since he had been examined and treated by Dr. Sioss within five years of the application and had been advised to have tests, some of which he took and some of which he did *415 not complete. We are satisfied that in his answer to question 34 the insured made either innocent or deliberate misrepresentations of indisputably material facts concerning his health and that such materiality was not the subject of a finding of fact to be made by the jury. However, this conclusion does not end the inquiry in this case since it is clear that NML did not totally rely upon the false representations by the insured.
The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry. John Hancock & Ins. Co. v. Cronin, 139 N.J. Eq. 392, 398 (E. & A. 1947). However, the law governing independent investigations seems clearly to have settled the principle that when one undertakes to make an independent investigation and relies upon it, he is presumed to have been guided by it and be bound accordingly. One cannot secure redress for fraud when he acted in reliance upon his own knowledge or judgment based upon an independent investigation. A false representation made to a person who knows it to be false is not in legal estimation a fraud. Id. at 397 It is clear that NML made some independent investigation. It obtained coded information from MIB indicating suspected, questionable or doubtful diabetes mellitus within the last six to ten years. The question is whether NML relied upon on its own investigation or to an appreciable degree on the false representation of the insured.
Based upon the information it received from MIB, NML again contacted Dr. Lewis, the doctor whom the insured had indicated as his treating physician, and asked a variety of questions including whether the insured had ever been diagnosed as a diabetic or had a blood sugar problem and for a range of his blood pressure readings. Dr. Lewis simply responded that he had no information on any of the requests and *416 added, "I have never treated the patient for any of the above ailments." NML received this second vague response from Dr. Lewis on July 17, 1987. On August 15, 1987, Tepper sent an additional urine specimen and NML indicated it would "rush code details," stating "PW feels no offer can be made without code details" according to notations in the "Supplement to Application Worksheet (Underwriting)." As noted in that document in an entry dated September 5, it was suggested that the matter be referred to facultative reinsurance.
According to another notation on the Supplemental Application Worksheet, the code details were received on September 7. This consisted of the letter from Dr. Finkelstein. From that letter NML was clearly informed that the insured had told Dr. Finkelstein in January 1971 that he had been told he was a potential diabetic. The letter included the results of a glucose test made at that time. Notwithstanding that information, NML decided to issue the policy with a standard premium, in the premium classification applied for, under its ASURT program. The policy was issued, however, without the requested Premium Waiver Benefit. It does not appear why NML was unable to obtain the information about Dr. Sioss and his report before issuance of the policy when it apparently obtained it within slightly more than a month after the insured's death.
The rule relating to the adequacy of the investigation once it is undertaken is explained in John Hancock & Co. Ins. Co. v. Cronin, supra, as follows:
It is only where the independent investigation discloses the falsity of the material representations or the source of the information is revealed by the insured where the parties are not in an equal position to know the facts, and in either event the knowledge gained or which could have been gained by the exercise of reasonable diligence is substituted for the insurance application, that the [insurance company] is precluded from relying upon the misrepresentations in the application. The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry. [139 N.J. Eq. 398.]
*417 This rule was interpreted by our Supreme Court in Gallagher v. New England Mutual Life Ins. Co. of Boston, where the court said:
The application of the above rules in a given situation is subject to the paramount duty of the insured to fully disclose all facts relating to his general health in the application when such information is requested. It is he and he alone who has the necessary complete knowledge of such facts, and his statements and answers in the application are a determinant qualitative factor in the equation of insurability which the insurer has to resolve before issuing a policy. It is only when the independent investigation of the company discloses sufficient facts to seriously impair the value of this determinant factor that further duty rests upon the insurer to investigate the statements and admissions in the application.
In granting summary judgment to NML on reconsideration, the trial judge seems to say that the question of the duty to conduct any further investigation is a matter of law for the court to decide. He said:
Counsel for Northwestern Mutual correctly points out duty to conduct any further investigation with regard to the diabetes question of law is questionable [sic]. And my review of the file and my review of Gallagher v. New England Mutual Life Insurance, 19 N.J. 14, indicates to me that the Gallagher tort [sic] indicated in that situation that there was no duty to further investigate.
Finding that the facts in this case are more sympathetic to the insurance carrier than in Gallagher, the trial judge ruled as a matter of law that NML had no duty to conduct any further inquiry in light of the information it had in its possession. In this the judge erred.
In Gallagher the Court refused to accept this principle:
[W]e do not agree with the contention [by the insurance company] where an insurance company is in possession of information which, if followed up, would disclose the true facts concerning the insured's health and medical history, it is, nevertheless, under no duty to make such further inquiry if the information which the company has is complete on its face and is not incompatible with insurability. [19 N.J. at 22]
Notwithstanding its disagreement with that proposition, on the facts in the case before it, the Supreme Court concluded in Gallagher:
[T]he decedent's lack of good faith in preparing this application is so gross as to preclude him from any consideration by a court of equity occasioned by the alleged neglect of the insurer to discover the misrepresentations. His answers both in the application and to the persons making the retail credit report *418 showed a studied campaign or scheme to deceive and to defraud, but since the representations in the application and the answers in the credit investigation are consistent with what was found in the medical examiner's report it cannot be said that the heart deviation shown by the MIB report seriously impaired the value to be given them on the question of insurability. This being so there was no further duty upon the insurer to investigate. [19 N.J. at 23]
In the circumstances presented in this case, we believe the extent of NML's knowledge as to whether the insured had noninsulin dependent diabetes mellitus and thus whether NML was obliged to further investigate was a question of fact for determination by the jury. In both its brief to the trial judge in support of its motion for summary judgment and in its brief before us, NML relies upon McKinley v. Slenderella Systems of Camden, N.J., Inc., 63 N.J. Super. 571 (App.Div. 1960), for the proposition that the question of the existence of a duty is one of law rather than one of fact. There, in the context of a negligence case, Judge Goldmann said:
Duty signifies conformance to a reasonable standard of legal conduct in light of the apparent risk. The existence of a duty is a question of law; failure in that duty must be proved as a fact. [63 N.J. Super. at 581]
In this case, the "duty" to further investigate information received by an insurance company which renders at least questionable answers given by the insured in an application, is not the same type of "duty" to which reference is made in the Slenderella case. As the Third Circuit Court observed in Parker Precision Products Co. v. Metropolitan Life Ins. Co., 407 F.2d 1070 (3rd Cir.1969), a case not unlike this case:
Appellant's major contention is that the jury should have been allowed to decide whether Metropolitan relied upon Parker's statements. An insurer is not entitled to rescind if it relied on other than an insured's representations in issuing the policy. John Hancock Mut. Life Ins. Co. v. Cronin, 139 N.J. Eq. 392, 51 A.2d 2, 169 A.L.R. 355 (1947). Whether it so relied may be a question for the jury. See Ettelson v. Metropolitan Life Ins. Co., 164 F.2d 660 (3rd Cir.1947) and 137 F.2d 62 (3rd Cir.1943), cert. den 320 U.S. 777, 64 S.Ct. 92, 88 L.Ed. 467 (1943).... [Emphasis supplied.] [407 F.2d at 1074.]
But see Garman v. Metropolitan Life Ins. Co., 175 F.2d 24 (3rd Cir.1949) (where the Court distinguished between a false answer to a subjective question and a false answer to an objective question, and concluded with respect to the latter that *419 a judgment in favor of the defendant insurance company should have been directed by the trial judge). Although the insured in this case also appears to have answered an objective question falsely,[8] the basis upon which NML seeks to rescind the policy is the insured's negative answer to question 33G referring to diabetes, although they suggest that a truthful answer to question 34A would have revealed the existence of Dr. Sioss.
In support of its motion for summary judgment NML submitted the affidavit of Patricia Diane Westphal,[9] a New Business Consultant, who states:
8. In accordance with Northwestern's normal underwriting practices, had Northwestern or I been aware of the fact that Allen Golden had uncontrolled diabetes, in combination with his build, a family history of cardiovascular disease, and proteinuria, Northwestern would have been unable to issue a policy in a standard premium class, and would have declined Allen Golden's application for insurance and referred its application to its facultative reinsurers.
Initially we observe that there is no question that NML had knowledge of the insured's build, family history of cardiovascular disease and the proteinuria. Thus Ms. Westphal is saying that if the knowledge which it had of these many material facts was accompanied by knowledge that he had "uncontrolled diabetes" NML would have been unable to issue a policy in the standard premium class. We believe it significant to analyze the condition alleged by Ms. Westphal to have added the extra weight to the other factors of which the company admittedly *420 had knowledge to refuse to issue the policy in the standard premium class.
Ms. Westphal uses the term "uncontrolled diabetes."[10] We first observe that the insured, at most, suffered from noninsulin dependent diabetes mellitus. Insulin dependent diabetes is a more serious disease. In an exhibit submitted by plaintiff to the trial judge with her brief in opposition to the motion for summary judgment, identified as "NML's guidelines," NML says: "The mortality rate is substantially higher in insulin dependent diabetes than in noninsulin dependent cases."[11]
Next, we must examine the information which NML had. It was aware that the insured had advised Dr. Finkelstein 13 years before that he had been told he was a potential diabetic. It also had the results of the glucose tolerance test administered at that time. Another of the exhibits attached to plaintiff's brief filed with the motion in opposition to NML's motion for summary judgment was a letter from Dr. Sanford M. Lewis (not to be confused with Dr. Jacob Lewis listed in the application as the insured's personal physician), who expressed the opinion that the glucose test result "... would indicate more than potential diabetes. Most authorities in 1981, with such test results, would label this actual diabetes." On the other hand, defendant points to these same glucose test results as being normal and thus additional evidence that NML could be *421 assured that the insured was not suffering from diabetes. While we recognize that Dr. Lewis may be wrong in his opinion as to what is shown by these test results, the existence of his opinion, it seems to us creates a factual question as to whether this should have alerted NML to the fact that the insured had some form of diabetes.[12]
It seems apparent that NML's investigation after the insured's death within the contestability period was much more thorough than their investigation prior to the issuance of the policy. Furthermore, the nature of the diabetic condition suffered by the insured in this case does not appear to have been sufficiently serious as to have rejected his application under NML's guidelines. In the period between his spasmodic visits to Dr. Sioss the insured did not take the hypoglycemic agents, and yet as soon as he took that medication his glucose returned to normal levels. We believe it is for the jury to determine from all of the facts presented whether NML would have rejected this policy had the insured disclosed that he had been diagnosed and was being treated by Dr. Sioss for noninsulin dependent diabetes mellitus. The assertion by NML after the insured's death that it would have is, of course, easily made, but it is for the jury to determine whether that determination would actually have been made at the time of the issuance of the policy.
We are satisfied that the trial judge's initial decision denying the motion for summary judgment was correct when he said:
The question is whether or not they [NML] reasonably responded to the information that was obtained and while this Court, if it were a fact-finder, would say so, as soon as you get into the question of whether or not their response was reasonable, you are going to tread into jury questions which perhaps reasonable men might differ.
* * * * * * * *

*422 In a situation where all of the information is in the hands of a third party, not a party to the lawsuit, I think it is for the jury to evaluate Dr. Sioss' testimony and to pass on the question of whether in fact he told plaintiff's decedent that he had diabetes.
We of course recognize that Dr. Sioss has filed an affidavit in which he affirmatively states that he told the insured that he had diabetes. The affidavit does not indicate the extent of Dr. Sioss' explanation to the insured as to the nature of noninsulin dependent diabetes as contrasted with the insulin dependent diabetic. Dr. Sioss' testimony as to his full explanation to the insured should reveal for the fact-finder the extent of the insured's knowledge as to his medical condition as is reasonable to infer he had at the time he answered the questions for Dr. Glass in his application. This of course would only relate to the subjective questions as to the state of his health. There does not appear to be any doubt as to the objective questions being answered falsely since Dr. Sioss clearly examined and treated the insured during the period set forth in his affidavit and supported by the medical bills.
Lastly, we address the observation by plaintiff that the insured did not die of diabetes.[13] We recently addressed this issue in Formosa, 166 N.J. Super. at 22, where we said:
Finally, we emphatically reject the court's suggestion that there must be a causal relationship between an applicant's false statements and the cause of his death before an insurer may rescind a life policy on the ground of equitable fraud. This is not the law in a majority of jurisdictions in this country, see 1 Appleman, Insurance Law and Practice § 215 at 331 (1965); 7 Couch on Insurance 2d, supra, § 35:87 at 102, and we hold that it is not the law of this State. See Metropolitan Life Insurance Co. v. Alvarez, 133 N.J. Eq. 65, 66-67 (Ch. 1943); Metropolitan Life Insurance Co. v. Coddington, 131 N.J. Eq. 430, 436-437 (Ch. 1942), cf. Dimick v. Metropolitan Life Ins. Co., 69 N.J.L. 384, 396 (E. & A. 1903).
While we accept this recent expression of the law on this subject by our court, we observe the language of N.J.S.A. 17B:24-3d, which reads:

*423 d. The falsity of any statement in the application for any policy or contract covered by this section may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer. [Emphasis supplied.]
The hazard assumed by the insurer was the death of the insured. If the death resulted from some medical condition which an insured failed to reveal by false statements in the application, that hazard would of course be materially affected. The question is raised that if the death results from a different cause, as in this case, has the hazard assumed by the insurer been "materially affected"? As we read the statute cause of death makes no difference. The language of the statute is in the disjunctive. But, in view of our recent statement in Formosa, we see no reason to further address this issue, particularly since the impact of N.J.S.A. 17B:24-3d has not been briefed.
Since we are satisfied that there are material facts in dispute which require resolution by the jury as initially found by the trial judge, we conclude it was improper for the judge to grant summary judgment on reconsideration.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] This section also contains an explanation of the yes answer to question # 35 and the language "for common cold two years ago" which we assume was intended to be opposite the answer to question # 34A.
[2] This language is pursuant to N.J.S.A. 17B:25-5 which reads as follows:

There shall be a provision that the policy, or the policy and the application therefor if a copy of such application is attached to or endorsed upon the policy when issued, shall constitute the entire contract between the parties, and that all statements contained in such an application shall, in the absence of fraud, be deemed representations and not warranties.
[3] Medical Information Bureau is a reporting service which exists as a means for insurance companies to exchange information alerting the companies to medical impairments that have been ascertained from either formal or informal applications made for insurance.
[4] NML has a policy of referring declined or high risk applicants to reinsurance companies. According to its brief, this affords the applicant the possibility of an offer of a more advantageous offer of insurance from the reinsurance company.
[5] In the "Supplement to Application Worksheet (Underwriting)" appears an entry "9/7 Code details received. Will issue std. vis. ASURT (NML Class 4)."
[6] Other information contained in Dr. Sioss' letter, concerned events which occurred subsequent to the issuance of the policy.
[7] Although the oral decision was rendered on March 7, 1988, the order denying the motion for summary judgment is dated March 4, 1988. Defendant has submitted an affidavit of the court reporter confirming that the decision was rendered on March 7, 1988. Accordingly, the motion for reconsideration on March 17, 1988 was timely.
[8] But see Ettelson v. Metropolitan Ins. Co., 164 F.2d 660, 666 (3rd Cir.1947), where the Court concluded that an insured's answer "Yes. Cold. One attack. Jan. 1938. About one week. Not sick. Rest at home. Cured.  Dr. Levy, Passaic," in answer to a question, "Have you consulted a physician for any ailment or disease not included in your above answers?" could not be regarded as other than true and sufficiently complete since the question was framed in the singular when the uncontradicted evidence was that the insured was also treated by Dr. Levy for a stomach condition and that Dr. Levy sent him to Dr. Roemer for X-rays and to Dr. Cohen for a blood count.
[9] Apparently she is the "PW" and "Pat" referred to in the Supplement to Application Worksheet (Underwriting) mentioned above.
[10] In the Formosa case, we noted that the doctor had testified that diabetes does not necessarily render a person uninsurable and that in certain circumstances policies are issued to persons suffering from the disease, in which case a higher premium is charged, 166 N.J.Super at 21, but in that case the insurance company would have rejected the policy "because he was a diabetic not under adequate supervision." Thus, we construe the word "uncontrolled" used by Ms. Westphal in her affidavit as meaning that Mr. Golden was not on medication for his condition.
[11] It is also interesting to note that this same guideline contains the statement, "Proteinuria is an extremely unfavorable sign. In the Equitable study, patients with modest proteinuria had a mortality rate of 1031%." The insured in this case suffered from proteinuria, a fact of which there is no dispute NML had knowledge and which is a symptom of diabetes.
[12] We of course recognize that defendant has failed to submit Dr. Lewis' opinion in the form of an affidavit which might have warranted disregarding it. However, since the trial judge did not refer to this information in any way in his opinion we do not know whether he disregarded it.
[13] As noted, the insured died of cardiac arrest due to or as a consequence of metastic renal cell carcinoma, the onset of which had been four months before his death on July 8, 1985 according to the death certificate.