709 A.2d 1366

CATHERINE SIMPSON AND DAVID B. SIMPSON, PLAINTIFFS–
APPELLANTS, v. RICHARD C. WIDGER, BRENDAN FURLONG,
AND ANDREW PHILBRICK, DEFENDANTS.

ANN SULLIVAN SCHER, DEFENDANT/THIRD–PARTY PLAIN-
TIFF–RESPONDENT, v. NANCY STEIN SIMPSON, THIRD–
PARTY DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 29, 1998—Decided May 14, 1998.

Before Judges D'ANNUNZIO and COBURN.

*Howard D. Cohen,* argued the cause for appellants (*Stern and Greenberg,* attorneys; *Mr. Cohen,* on the brief).

*J. Michael Nolan, Jr.,* argued the cause for respondent (*Pitney, Hardin, Kipp and Szuch,* attorneys; *Mr. Nolan, Joy Harmon Sperling* and *Zachary D. Rosenbaum,* on the brief).

The opinion of the court was delivered by

COBURN, J.A.D.

The Mighty Quinn, a six-year old show horse, was purchased by plaintiff David B. Simpson from defendant Ann Sullivan Scher on December 3, 1989. Over four years later, Simpson[1] filed this

---

[1] Although Catherine Simpson is named as a plaintiff, she was not directly involved in the transaction. She is the daughter of David and the one for whom he purchased the horse.

action under Article 2 of the Uniform Commercial Code, *N.J.S.A.* 12A:1–101 to:11–108.[2]   He claims entitlement to damages for breach of an express warranty based on the seller's representation that the horse was sound.   Simpson asserts that at the time of the sale Scher knew the horse might have ringbone disease, a condition which could adversely affect the horse's resale value and, at sometime in the future, its ability to compete.

Scher[3] successfully moved for summary judgment in the Law Division.   Plaintiffs appeal, contending there are material issues of fact which should be resolved by a jury.   Scher argues that her statements regarding the horse were either true or merely statements of opinion and not express warranties.   In the alternative, she contends there is insufficient evidence of fraud, and, consequently, the action is barred by the Code's four-year statute of limitations, *N.J.S.A.* 12A:2–725.

### I.

We find that the evidence, viewed most favorably for plaintiffs, establishes the following facts.

Scher, a professional riding instructor and horse trainer since 1974, owned a stable in West Orange which housed about fifty horses and was known as Suburban Essex Equestrian Center.   In her career she had bought or sold over a hundred horses.   In 1986 she began using Dr. Brendan W. Furlong and Dr. Donald Bruno, two veterinarians who practiced together, for advice on the health of horses she wanted to purchase.

In the spring of 1989, Scher purchased five horses in Belgium, including The Mighty Quinn, for $110,000.   She paid $20,000 to

---

[2] Although the complaint asserts a right to relief based on other theories, plaintiffs neither relied upon them below nor suggest their relevance on appeal. All are agreed that the rights of the parties are governed by the Uniform Commercial Code.

[3] The actions against the other defendants were dismissed and are not the subject of this appeal.

ship the horses to New Jersey, and they arrived here by the end of June. In making this purchase, she relied on Dr. Bruno's examination of the horse in Belgium and on his opinion, although he did not provide her with any details regarding what the examination revealed.

Within a few days of The Mighty Quinn's arrival, Scher called Richard Widger, the operator of a large stable in Rockleigh, from whom she had purchased over fifty horses since 1980. Scher had acquired The Mighty Quinn for resale and wanted Widger's assistance in that regard. They agreed that if he found a purchaser she would pay him a commission of $5,000.

Plaintiff David B. Simpson has been a lawyer since 1965, specializing in business transactions. Between 1981 and 1989, he had purchased six horses for his children from Widger. In July 1989, the two horses that Simpson was boarding at Widger's farm became unridable. As a result, Simpson approached Widger, asking him to assist in finding a suitable horse for his daughter Catherine. In August 1989, Widger told Simpson about The Mighty Quinn, a horse which he believed Catherine could use in competitive shows.

After seeing the horse, Simpson decided to have it moved to Widger's farm, where he and his daughter could spend some time observing and testing its capabilities and potential as a show horse. During the time the horse was at Widger's farm, Simpson decided to have the horse examined for soundness by a veterinarian. The examination, which included x-rays of the horse's legs, was performed on October 24, 1989, by Dr. Furlong, who had cared for all of Simpson's horses.

There is a substantial conflict about what Dr. Furlong observed on the x-rays and about what he said in that regard to Widger and then to Simpson over the telephone in Widger's presence. For present purposes we will assume that Dr. Furlong's analysis of the x-rays of The Mighty Quinn's left front foot should have resulted in findings which accorded with those of plaintiffs' experts, Drs. Paxton and McIlwraith.

Dr. Paxton indicated the x-rays showed "changes ... of the left front pastern and foot." He added that the changes were "obvious and significant in prognosticating the gelding's condition, performance capabilities, value and future salability." He also noted "the *potential* for their expansion into articular ringbone with resulting lameness...." (Emphasis added). He concluded that the 1989 x-rays showed that the horse's "*long-term* prognosis for soundness was guarded." (Emphasis added).

Dr. McIlwraith also observed that the 1989 "radiographic changes are indicative of the *potential* for expansion into articular ringbone which *could* lead to lameness." (Emphasis added). He would have advised the purchaser "that such radiographic changes would deter future purchasers, notwithstanding that such changes *might not progress or cause actual lameness.*" He also noted "changes" in bone structure on the distal aspect of the second phalanx; however, they were within "normal range." (Emphasis added).

According to Widger, Dr. Furlong said the horse was sound but that the x-rays had shown "remodeling." Widger asked, "Tell me something in layman's terms, between 1 and 10, making 10 the worst, how would you ... value this horse?" He said the doctor replied, "between 5 and 6." Widger immediately conveyed this information to Simpson in a telephone call from the doctor's office and then handed the telephone to the doctor who gave Simpson the same information, and added the following statement:

> [Y]ou've bought horses from Mr. Widger that had worse x-rays ... Bart and Mo. And ... everything went all right with them, so it's a gamble whether they might ... be problems down the road.

According to Simpson, Dr. Furlong said the horse was sound, but "there was something which he called a change—I think he used the term 'change.'" Simpson further recounted:

> And I asked him what he meant. I didn't understand any of the technical jargon. What he said to me was ... that the change was some sort of irregularity of some sort.

He could not recall whether Dr. Furlong had used the word "remodeling," but he was aware that the changes had shown up on x-rays.

Widger then took the telephone and advised Simpson not to consummate the purchase. Although Simpson asserted that Widger recommended the purchase, he also admitted he knew there was a problem and that he decided to have the horse returned to defendant's stable, which was done by Widger that day. Catherine testified that after the doctor's examination she "became emotionally upset when Mr. Widger told me that there was some problem and that might mean I couldn't get the horse." Simpson admitted that shortly after the examination, Widger brought another horse to his farm for Catherine to consider instead of The Mighty Quinn. The other horse proved unsatisfactory and Simpson decided to pursue the purchase of The Mighty Quinn.

Before describing the subsequent conversations between Scher and Simpson upon which Simpson rests his case of warranty breach and fraud, we must describe what the evidence shows with respect to what Scher knew about ringbone and what she learned from Widger and Dr. Bruno regarding the outcome of Dr. Furlong's examination of the horse.

When Widger returned the horse to Scher, he told her that Dr. Furlong found "problems with the x-rays," "changes." He also described the doctor's five to six rating of the horse's value. Finally, he told her that he had advised Simpson to withdraw from the purchase.

Later that week, when Dr. Bruno visited Scher's stable on other business, she asked him "if there was anything to worry about with the horse. . . ." He told her Dr. Furlong had found an "irregularity on a bone." However, she asked Dr. Bruno about the cause of the irregularity, and he said it was from "calcium" and might have been caused by the horse striking "a jump." During her deposition, she testified that Dr. Bruno's comments did not seem significant since he had just "vetted" the horse in

Europe. She understood he was referring to calcification of a bone, but she "didn't take it as though my horse had a disease."

Scher understood ringbone as meaning a "calcification on one of the bones in the front of the hoof." She had never had one of her horses diagnosed with the disease that did not also limp. She would not have purchased a horse for resale that had ringbone.

Simpson, motivated by Catherine's intense desire to own The Mighty Quinn, returned to Scher's stable and engaged her in the conversations upon which his action is based. He told Scher that Dr. Furlong had said "there was a problem with the x-rays." He emphasized that the horse was expensive and that he was "concerned because I heard something I didn't fully understand and it made me a little nervous." According to Simpson, Scher assured him "that the horse was a good horse, that the horse was a sound horse and that the horse was appropriate for me to buy, that I would not have a problem with the horse." He also testified that "the substance of our conversation was that this horse was a good horse and was worth the money."

Despite Scher's reassurances, Simpson did not decide to purchase The Mighty Quinn until he received and reviewed a letter from Dr. Debarsy, who had been the horse's veterinarian in Belgium when it was sold to Scher. The letter said, "The X-rays of 1989 show absolutely no deterioration from those taken in 1987. I conclude that a Sale Transaction can be made on my evidence that there is no sign of clinical lameness on this above-mentioned animal."

The purchase of The Mighty Quinn was concluded on December 3, 1989, at a price of $70,000. Thereafter, the horse competed in many equitation events, on occasion winning "prize monies." However, by 1994 ringbone was identified as having manifested itself to the point that the horse would evidence lameness at times.

Dr. Paxton, asked to examine the horse for "a chronic, intermittent, low grade lameness in the left front leg" which had been noted by the horse's trainer who "was concerned that it would

affect the gelding's performance in some up-coming shows," described the horse's condition as of February 23, 1994, in this way:

> "Quinn" had a very noticeable enlargement on the front and side of the pastern, just above the coronary band on the left forelimb. He was moderately lame after the pastern/fetlock were flex tested. He was also lame when he was lunged left on a hard surface (a grade 3 out of 5 lame).

> Radiographs were taken by me on February 23, 1994. The radiographs showed significant chronic changes (osteophytes and bone remodeling) consistent with ringbone in the middle and distal phalangeal joints.

> At the time, a prognosis for long term soundness was guarded to poor because of the condition and its further deterioration.

Dr. McIlwraith reviewed the 1989 and 1994 x-rays and essentially concurred with Dr. Paxton's findings. He observed that from 1989 to 1994 the "radiographic changes did progress...." He stated:

> Although Dr. Furlong's [original] report does note remodeling, there is no indication in the report that the potential significance of remodeling was explained to the prospective purchaser. The use of the term "remodeling" implies evidence of an overactive or abnormal bony response (usually associated with trauma). This would be appropriate for the prospective purchaser to fully understand the significance of the radiographic findings and thereby be in a position to make a decision as to whether or not to purchase the horse and understand the effect on the resale value of the horse.

## II.

Article 2 of the Uniform Commercial Code, *N.J.S.A.* 12A:1–101 to:11–108, governs the sale of animals in commerce. *See N.J.S.A.* 12A:2–102, –105(1). In deciding whether statements by a seller constitute express warranties, the reference point is *N.J.S.A.* 12A:2–313 which, in relevant part, provides the following:

> (1) Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> * * *

> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a

statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

■ In his deposition, Simpson said Scher used these phrases in describing The Mighty Quinn: "good horse," "sound horse," "appropriate for [him] to buy." He also testified that "the substance of our conversation was that this was a good horse and was worth the money." In a certification, he added that he told Scher he wanted to be sure he would be able to resell the horse after Catherine went to college.

To the extent that Scher affirmed the value of the horse, it is clear that no warranty was created under *N.J.S.A.* 12A:2–313(2), *supra,* since that section expressly excludes affirmation of value from the concept of express warranty. The words "good" or "appropriate for purchase" added nothing to what was clearly the essence of the seller's representation, which was that The Mighty Quinn was sound.

■ The concept of soundness in a horse is somewhat complex. At oral argument plaintiffs' counsel conceded that the horse was sound; however, he was using the word to describe the horse's capabilities to perform at the time of sale. In essence, the plaintiffs' position is that the horse was unsound because of potential problems indicated in the x-rays of its left front leg. Although Dr. Furlong described the condition in his deposition as ringbone, he also clearly stated the horse was then sound. The plaintiffs' experts both described the condition as having the potential for expansion into articular ringbone which could lead to lameness. They conceded the horse was otherwise sound in the sense of its ability to perform when plaintiff bought it.

Soundness in a horse has been described in these words:

A *sound* horse is free from any abnormality in the form or function of any part. A *serviceably sound* horse is one capable of doing his job although he may have some minor unsoundness or blemish not serious enough to incapacitate him. No other quality is more important than soundness in determining a horse's value.

[John M. Kays, *The Horse, A Complete Guide to Its Care and Handling* 3 (3rd ed., Arco Publishing, Inc.1982) (emphasis added).]

> The single most important factor in determining the value of any horse is his degree of soundness. The veterinarian considers any abnormality in the form or function of any part an unsoundness. Not many horses can be certified as 100 per cent sound according to this interpretation. *The practical horseman seeks serviceable soundness.* He regards the more minor troubles—those that do not incapacitate a horse for his job but only mar his looks—more as blemishes than as true unsoundnesses.
>
> [*Id.* at 75 (emphasis added).]

Ringbone appears to be generally regarded as "a serious unsoundness because it so often results in severe lameness and inability to do any job." *Id.* at 76. On the other hand, it has also been observed that some cases of ringbone "don't seem to bother the horse very much." Carin A. Smith, D.V.M., *Easy Health Care For Your Horse* 171 (Prentice Hall Press, 1991).

That The Mighty Quinn was serviceably sound is not questioned in this case. The horse was capable of performing as a show horse and did so for some years without problem. On the other hand, it was certainly not sound in the sense of being a hundred percent free of abnormality of form: the 1989 x-rays revealed abnormal boney growth.

In *Norton v. Lindsay*, 350 *F.*2d 46 (10th Cir.1965), the plaintiff, a purchaser of a race horse, obtained summary judgment against the seller on the ground that there had been a breach of an express warranty that the horse was sound. Prior to sale, the horse had received an operation called "high nerving" which precluded it from racing. In affirming, the court had this to say:

> We agree with the trial judge that the affirmation of fact here was the words that "the horse was sound."
>
> \* \* \*
>
> The word "sound" when used with reference to many animals and especially a horse has a special and particular connotation. The statement that a horse is "sound" implies "the absence of any defect or disease which \* \* \* will impair the animal's natural usefulness for the purposes for which it is purchased \* \*." In other words, using the word "sound" in describing the horse in this case clearly constituted an express warranty of fitness as a race horse, which was the purpose for which it was purchased.    .
>
> [*Id.* at 49 (footnote and citations omitted).]

The *Norton* court's view of the meaning and legal effect of the word "sound" in the context of horse sales finds support in 2 *Williston On Sales* § 15–6, at 375 (5th ed.1995) and was recognized as appropriate in New Jersey over 130 years ago in *Perrine v. Serrell*, 30 *N.J.L.* 454 (Sup.Ct.1864). Perrine purchased a horse from Serrell who had warranted the horse as sound. "On the afternoon of the day on which the colt was sent to [Perrine] ... he coughed considerably. He was well taken care of and nursed. He grew worse from day to day, and in a month afterwards died from inflammation of the trachea and lungs." *Id.* at 457. Perrine prevailed on his suit for breach of warranty. While the point was not in issue, the court's opinion indicated no doubt that the representation was one of fact.

Other courts have taken a different tack. For example, in *Sessa v. Riegle*, 427 *F.Supp.* 760 (E.D.Pa.1977), *aff'd o.b.*, 568 *F.*2d 770 (3rd Cir.1978), the court held that a representation of soundness could be an opinion or commendation rather than an express warranty, depending on the circumstances of the sale. *Id.* at 765. In finding that the statement was merely opinion in the context of its case, the court distinguished but did not disagree with the result in *Norton*. *Id.* at 765 n. 3. However, the court did say this:

> In other words, because horses are fragile creatures, susceptible to myriad maladies, detectable and undetectable, only where there is an "understanding" that an ignorant buyer, is relying totally on a knowledgeable seller not "to make a mean deal," are statements as to soundness taken to be anything more than the seller's opinion or commendation.
>
> [*Id.* at 766 (footnote omitted).]

The views expressed by the *Sessa* court appear unduly restrictive. However, they are useful in pointing out the problem of defining what is meant by a representation that a horse is sound. In our view, the proper principle of law to be drawn from the aforementioned authorities is that "sound" in the context of horse dealing means "serviceably sound." Indeed, that is in essence what the court held in *Norton, supra.* Given that definition, the representation of the defendant Scher in this case was true and

cannot be the basis of a cause of action for breach of express warranty.

## III.

Plaintiffs contend that when a seller warrants that a horse is sound that warranty should be taken as including a representation going beyond present serviceability. In other words, they claim the representation should be construed as meaning that the horse has no disease or condition which *might* interfere with its serviceability or salability during the useful life of the animal. In that connection they argue that Scher, based on her knowledge of ringbone, her understanding of calcification as a possible indicator of the disease, and the information she had received from Widger and Dr. Bruno, believed at the time of sale that the horse *might* have ringbone which *might* cause lameness and that an informed buyer would have rejected the horse. Even if we were to accept those propositions, which we do not, plaintiffs would not be entitled to prevail because of the untimely filing of their action and their inability to prove fraud.

An action on an express warranty under the Uniform Commercial Code must be filed within four years of the sale. *N.J.S.A.* 12A:2–725. This action was not so filed. However, the presence of fraud may toll the running of the statute. *Cf. Joseph v. Lesnevich,* 56 *N.J.Super.* 340, 355, 153 *A.*2d 349 (App.Div.1959); *Kohler v. Barnes,* 123 *N.J.Super.* 69, 79, 301 *A.*2d 474 (Law Div.1973). There is no suggestion here of active concealment after a fraud was committed. Rather, the charge is that the fraud went undiscovered until after the statute of limitations had run. In that case, the period of limitations begins to run "when plaintiff should have discovered the fraudulent scheme...." *B.F. Hirsch, Inc. v. Enright Refining Co.,* 577 *F.Supp.* 339, 344 (D.N.J.1983), *aff'd in part, vacated in part on other grounds,* 751 *F.*2d 628 (3rd Cir.1984) (citation omitted); *cf. Diamond v. New Jersey Bell Tel. Co.,* 51 *N.J.* 594, 242 *A.*2d 622 (1968). We will assume that the

plaintiffs had no reason to discover the alleged fraud before the examination of the horse by Dr. Paxton in 1994.

■ "A misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Jewish Ctr. of Sussex County v. Whale,* 86 *N.J.* 619, 624, 432 *A.*2d 521 (1981) (citations omitted).

■ Viewing the evidence most favorably for plaintiffs, the most that can be inferred is that Scher knew that the presence of ringbone was a *possibility* which *might* affect the horse's serviceability and resale value. Possibilities are not "presently existing" facts. Nor should we lose sight of the rule that fraud must be proven by clear and convincing evidence. *Stochastic Decisions, Inc. v. DiDomenico,* 236 *N.J.Super.* 388, 395, 565 *A.*2d 1133 (App.Div.1989), *certif. denied,* 121 *N.J.* 607, 583 *A.*2d 309 (1990).

■ Even if we assume that Scher's statement was a knowing, material misrepresentation of an existing fact, made with the intent that Simpson rely on it, the action would still fail because of the absence of reliance as a matter of law resulting from these factors: (1) Simpson obtained an independent examination of the horse by Dr. Furlong; (2) after Scher said the horse was sound, Simpson did not agree to the purchase until he had reviewed Dr. Debarsy's opinion respecting the significance of the x-rays (this was a second independent examination); and (3) although Scher might have had a greater appreciation of the possible significance of the x-ray findings than Simpson did, she did not withhold any fact with respect to them.

In *Byrne v. Weichert Realtors,* 290 *N.J.Super.* 126, 675 *A.*2d 235 (App.Div.), *certif. denied,* 147 *N.J.* 259, 686 *A.*2d 761 (1996), an action for fraud based on the failure to disclose termite infestation in a house sale, we said:

> In instances in which a party undertakes an independent investigation and relies on it, there can be no reliance. Thus, where a purchaser has obtained the services

of a pest control business to conduct a termite inspection and has relied on the results of the inspection, the purchaser may not proceed against the previous owners and their agent.

[*Id.* at 137, 675 *A*.2d 235 (citations omitted).]

The *Byrne* court went on to note an exception to this rule upon which the plaintiffs rely. The court recounted that even though the purchasers had obtained an independent examination, they learned from it only that there was minor termite infestation. The seller obtained an inspection which revealed major infestation and substantial structural damage. He did not disclose that information to the purchasers even though he was aware of the superficial nature of the inspection which they had obtained, and he persisted in representing that the problem was minimal. In those circumstances, the court held that a jury could find that the purchasers had relied upon the seller's representation regarding the extent of the damage even though they had obtained an independent examination. *Id.* at 137–39, 675 *A*.2d 235.

Plaintiffs also cite *Golden v. Northwestern Mut. Life Ins. Co.,* 229 *N.J.Super.* 405, 551 *A*.2d 1009 (App.Div.1988), with respect to their claim of a right to rely on what Scher said despite their independent investigations. However, the following observations in that case support Scher's position:

The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, *unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry. However, the law governing independent investigations seems clearly to have settled the principle that when one undertakes to make an independent investigation and relies upon it, he is presumed to have been guided by it and be bound accordingly. One cannot secure redress for fraud when he acted in reliance upon his own knowledge or judgment based upon an independent examination.*

[*Id.* at 415, 551 *A*.2d 1009 (citations omitted)(emphasis added).]

Plaintiffs contend the evidence established the existence of a question of fact on the issue of reliance. We disagree.

Simpson obtained an independent examination of The Mighty Quinn. The results of that examination were revealed to him by both Widger and Dr. Furlong, and were confirmed by Dr. Debar-

sy. Simpson knew there was a problem shown by the x-rays of the horse's left foreleg. Indeed, based upon the x-ray results and Dr. Furlong's comments thereon, he initially returned the horse to Scher and had Widger present another horse for possible purchase. Scher's factual information regarding the horse's actual condition was all secondhand and was no greater than that received by Simpson or available to him by further inquiry of Dr. Furlong. Scher did not fail to disclose any fact regarding the condition of the horse. At most, she withheld an opinion that the possibly existent condition might affect the horse's resale value.

When deciding a motion for summary judgment under *R.* 4:46–2, a judge is required to consider whether the evidence presented, "when viewed in the light most favorable to the non-moving party," is sufficient to permit a "rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). While credibility determinations are "to be made by a jury and not the judge," if there is a "single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of *Rule* 4:46–2." *Id.* at 540, 666 *A.*2d 146 (citations omitted). In other words, if "a rational jury can reach but one conclusion" on the alleged disputed issue of fact based on the "evidential materials presented," then the evidence "creates no 'genuine' issue of material fact precluding the grant of summary judgment under *Rule* 4:46–2." *Id.* at 540–41, 545, 666 *A.*2d 146.

The only evidence in this case of reliance is Simpson's statement that although he relied upon the opinions of the veterinarians, he also relied on what Scher said. He admits that Dr. Furlong, whom he had retained, told him the horse was "sound." Scher said no more than that. Dr. Furlong had the benefit of his professional examination and his ability to read the x-rays. Scher had only secondhand information about a horse which appeared to be fit in all respects. *Byrne* and *Golden* are clearly distinguish-

able cases. In *Byrne, supra,* the seller withheld information which he knew was inconsistent with the information obtained by the purchasers in their superficial, independent examination. 290 *N.J.Super.* at 130–33, 675 *A.*2d 235. In *Golden, supra,* the insured had made specific statements about his health which were false. 229 *N.J.Super.* at 408–12, 551 *A.*2d 1009. Neither of those circumstances is present here. Simpson had the benefit of a complete physical examination by a veterinarian of his choice, the same veterinarian who had cared for his prior horses and had, on occasion, examined horses Simpson was interested in purchasing. Although he claims some degree of lack of understanding with respect to the opinions he received from Dr. Furlong, defendant Scher is not to be faulted for Simpson's failure, if it was that, to demand clarification from the doctor. Consequently, under the principles of *Byrne* and *Golden* plaintiffs are not entitled to claim reliance upon the statements of Scher. The undisputed circumstances here precluded a finding of reasonable reliance by Simpson and required the entry of summary judgment. *Cf. DSK Enterprises, Inc. v. United Jersey Bank,* 189 *N.J.Super.* 242, 251, 459 *A.*2d 1201 (App.Div.), *certif. denied,* 94 *N.J.* 598, 468 *A.*2d 232 (1983).

*IV.*

One other aspect of this case must be mentioned since the judge's handling of it requires reversal of a portion of the judgment which we have not yet discussed.

Scher filed a counterclaim against Simpson and a third-party complaint against his wife, Nancy. Those pleadings sought $1,625 for boarding and training The Mighty Quinn. Scher received judgment unsupported by findings of fact or conclusions of law. Given the conflicting evidence on this point, the judge's violation of *R.* 1:7–4 and *R.* 4:46–2(c) requires reversal of this aspect of the judgment.

Affirmed in part, reversed in part, and remanded for further proceedings on the counterclaim and third-party complaint.