**MEDIMATCH, INC., and International Trading & Exchange, Inc., on behalf of themselves and on behalf of a class of other similarly situated, Plaintiffs,**

v.

**LUCENT TECHNOLOGIES INC., AT & T Corporation and AT & T Capital Corporation, Defendants.**

**No. C-99-3198 TEH.**

United States District Court, N.D. California.

Oct. 24, 2000.

Barry R. Himmelstein, Melanie M. Piech, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA, for Plaintiff.

Timothy P. Crudo, Dana N. Linker, Latham & Watkins, San Francisco, CA, James E. Tyrell, Jr., Joseph E. Hopkins, Scott Louis Weber, Latham & Watkins, Newark, NJ, for Defendants.

## ORDER GRANTING IN PART, DENYING IN PART, DEFENDANTS' MOTIONS TO DISMISS

HENDERSON, District Judge.

### INTRODUCTION

This is a consumer fraud action brought by plaintiffs MediMatch Corporation and Intrax Corporation on behalf of themselves and a potential class. MediMatch and Intrax purchased and/or leased a modest volume of business telephone products from the manufacturer, Lucent, and its financing affiliate, Newcourt. Plaintiffs' suit boils down to the claim that defendants misrepresented or concealed Y2K defects in the equipment, and that Lucent refused to repair or replace the telephone equipment free of charge.

Plaintiff's Amended Complaint asserts three causes of action:

1. Violation of New Jersey's Consumer Fraud Act;

2. Breach of Implied Warranties of Merchantability; and
3. Fraudulent and Unfair Business Practices in violation of California Business and Professions Code sec. 17200 et seq.

Defendants have moved for dismissal. The Court issued a comprehensive Tentative Order, and subsequently heard argument by counsel for all parties on September 25, 2000. Having fully considered the written and oral arguments of counsel, including counsel's responses to the Tentative Order, the Court hereby issues its final order on the motion.

## I. FACTUAL BACKGROUND

### A. The Parties

Plaintiff MediMatch, Inc. is a small California-based business that matches health care professionals with job openings in the health care field. Plaintiff International Trading & Exchange, Inc. ("Intrax") is a small California-based business that places foreign exchange students in the United States and teaches them English. The First Amended Complaint also seeks to convert the case to class action status.

Lucent and AT & T Corporation are the manufacturers of the telecommunications equipment at issue. In 1996, mid-way through the various sales at issue in this litigation, AT & T split into three stand-alone companies. The communications systems and technology branch of AT & T became Lucent Technologies, Inc. The information services branch of AT & T retained the AT & T name. Since defendants make no distinction between AT & T and Lucent for liability purposes at this stage, the two entities will be referred to herein as "Lucent" for the sake of simplicity and to avoid confusion regarding the various entities which at some time have carried the AT & T moniker.

Newcourt Communications Financing Corp., which is the legal successor to AT & T Credit Corp., is the leasing company which provided the financing for plaintiffs' acquisition of much of the Lucent equipment. These two companies will be referred to herein simply as "Newcourt." Plaintiffs allege that Newcourt "is the exclusive or preferred provider of financing services for equipment manufactured by Lucent," and that AT & T Credit "was established as a captive finance company of AT & T."

### B. The Facts

Plaintiffs acquired business telephone products from Lucent at various times between 1993 and 1996. Plaintiffs did so either by purchasing the equipment directly from Lucent, or by leasing it through Newcourt. These products include telephone message systems, fax mailboxes, and interactive voice response systems.

During 1998 and 1999, Lucent informed plaintiffs that the equipment was not Y2K compliant. Lucent also informed plaintiffs that it would not remedy the problem without charge. Rather, Lucent informed plaintiffs that it would offer temporary alterations or upgrades for a fee, or that plaintiffs could purchase new systems. The essential problem here, as with all Y2K malfunctions, is that because the software was programmed to read only two-digit year dates, the devices would not be able to distinguish between centuries. Thus, at midnight on New Year's eve 2000, Y2K non-compliant devises would be unable to determine whether 01/01/00 means "1900" or "2000." The products' inability to make that distinction potentially could have impaired the products' operation.

In December 1999, MediMatch removed the Lucent systems from operation and leased replacement equipment with fewer functions from another vendor. Intrax, which had a lease agreement with Newcourt that extended into 2001, returned its equipment to Newcourt and leased replacement equipment from another vendor as well. Newcourt then demanded payment for the unexpired term of Intrax's leases, and filed suit against Intrax in New

Jersey state court in August 1999 to recover the balance of its lease payments and liquidated damages.

Plaintiffs essentially claim that defendants knew that their products were not Y2K compliant and that they would cease to function properly after December 31, 1999. Plaintiffs further claim that defendants misrepresented or concealed the Y2K defect, that defendants sold or leased the products with promises that they would last well into the future, and that defendants refused to repair or replace the telephone systems without additional charge.

### C. Procedural Background

MediMatch filed the initial Individual and Class Action Complaint on June 30, 1999. Defendant Lucent answered on July 28, 1999. Lucent moved for judgment on the pleadings under FRCP 12(c) on September 17, 1999. Defendant AT & T Capital Corporation (erroneously named instead of Newcourt) filed a motion to dismiss, and both motions were consolidated for hearing. The case was subsequently reassigned, and the hearing date was postponed. After MediMatch filed its opposition to both motions, the Court entered a stipulated order taking the motions off calendar and allowing MediMatch to file an amended complaint. MediMatch did so, and in the First Amended Complaint it named Newcourt as the lessor of the equipment, added Intrax as a second named plaintiff, and retained the same three causes of action as in the original complaint.

Defendants now seek dismissal of all three causes of action, and a protective order to stay discovery.

## II. LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(6) when a plaintiff's allegations fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The Court must accept as true the factual allegations of the complaint and indulge all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff. *Westlands Water Dist. v. Firebaugh Canal,* 10 F.3d 667, 670 (9th Cir.1993); *NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Unless the Court converts the Rule 12(b)(6) motion into a summary judgment motion, the court may not consider material outside of the complaint. *Lucas v. Department of Corrections,* 66 F.3d 245, 248 (9th Cir.1995); *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994). Documents attached to the complaint and incorporated therein by reference, however, are treated as part of the complaint for purposes of Rule 12(b)(6). *Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995). In addition, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting it into one for summary judgment. *Branch,* 14 F.3d at 454; *see Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir. 1998)

The Court must construe the complaint liberally, and dismissal should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295 (9th Cir. 1998); *Johnson v. Knowles,* 113 F.3d 1114, 1117 (9th Cir.1997); 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1990), quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Dismissal without leave to amend is appropriate only where a court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996); *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987).

## III. DISCUSSION

### A. Preliminary Considerations

#### 1. The Pleading Requirements of the Y2K Act

On July 20, 1999, Congress enacted the Y2K Act, 15 U.S.C. § 6601, *et seq.* The Act provides specific notice and pleading requirements for "any Y2K action brought after January 1, 1999, for a Y2K failure occurring before January 1, 2003, [or] for a potential Y2K failure that could occur or has allegedly caused harm or injury before January 1, 2003." 15 U.S.C. § 6603(a). If an action falls within that time frame, the Act requires, in relevant part, a specific statement of the nature and amount of damages, a specific description of the manifestations of material defects in the products, and a statement of facts giving rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 6607. The parties here do not contest that this is a "Y2K action" within the meaning of the Act.

#### a. The Action Falls Within the Time Frame Established by the Y2K Act

■ Plaintiff MediMatch's original complaint was filed on June 30, 1999. This was prior to enactment of the Act, but subsequent to the date of the Act's retroactivity provision. Plaintiff Intrax joined this litigation by filing the Amended Complaint with plaintiff MediMatch on January 31, 2000. That was the same date on which defendant Newcourt was substituted for AT & T Capital Corporation.

The Court finds that the Y2K Act applies retroactively, and therefore controls all parties and allegations in this case. Both parties recognize the importance of the Supreme Court's seminal decision in

*Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In that decision, the Court held that various provisions of the 1991 Civil Rights Act should not apply retroactively absent "clear evidence of congressional intent" to do so. *Id.* at 286, 114 S.Ct. 1483. The Court noted a presumption against retroactive legislation that is deeply rooted in the nation's jurisprudence, but also stated that retroactivity provisions "often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." *Id.* at 267–68, 114 S.Ct. 1483.

The Y2K Act differs markedly from the 1991 Civil Rights Act, in that the former contains an explicit statement of retroactive coverage ("any Y2K action brought after January 1, 1999"), whereas the latter contained no such express command. *See* 15 U.S.C. § 6603(a); *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. The explicit statement in the Y2K Act "helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Landgraf*, 511 U.S. at 268, 114 S.Ct. 1483. Further, while the *Landgraf* Court had to resort to judicial default rules to determine congressional intent, the Court noted that such resort is unnecessary where, as here, "Congress has expressly prescribed the statute's proper reach." *Id.* at 280, 114 S.Ct. 1483.[1]

The Court further finds that defendants did not waive the requirements of the Y2K Act. Plaintiff's argument that by answering the complaint defendants thereby

---

1. Plaintiffs cite *Landgraf*, 511 U.S. at 275 n. 29, 114 S.Ct. 1483, and *Hyatt v. Northrop Corp.*, 80 F.3d 1425, 1429 (9th Cir.1996), for the proposition that new procedural rules governing the filing of complaints should not apply to complaints that already have been properly filed. However, in neither of those cases did the statutes in question contain an

explicit retroactivity provision, as the Y2K Act does. Furthermore, it is not clear that the Supreme Court in *Landgraf* intended its statement to apply to anything other than the procedural aspects of filing a complaint, in contrast to the heightened pleading requirements of the Y2K Act.

waived all applicability of the Act is unsupported by reason or authority, and therefore is rejected. Thus, the Court finds that plaintiffs must meet the heightened pleading requirements of the Y2K Act.

### b. Heightened Pleading Under the Y2K Act

#### (i) Damages

■ The Y2K Act requires that the complaint contain "specific information as to the nature and amount of each element of damages and the factual basis for the damages calculation." 15 U.S.C. § 6607(b). The purpose of this and other related provisions is to provide for an early detailed disclosure of the plaintiffs' claims to allow quick informal resolution by the parties, thereby avoiding costly litigation. *See* 15 U.S.C. § 6601(a)(8).

Plaintiffs specify in the Complaint that MediMatch paid $32,550.24 to purchase its system following the lease term, during which it had paid $69,835.80, and that the system had an actual fair market value of no more than $1,200 due to its Y2K noncompliance. *See* First Amended Complaint (hereinafter "Complaint") para. 39, 40. Plaintiffs also state that MediMatch was forced to abandon its investment "of over $100,000" and to lease other equipment (for which it does not provide a dollar amount). *Id.* para. 45. Thus, while plaintiffs have provided some specific information along with a factual basis for damages, the actual amount of damages being claimed remains ambiguous. For example, is MediMatch claiming damages of the full purchase price alone, the full purchase price plus a portion of the lease amount, the purchase price less its fair market value or less a percentage for partial use, or will it use some other calculation?

Similarly, the Complaint provides the detailed amounts of Intrax's monthly lease payments, as well as the monthly cost of its replacement equipment, and the amount Newcourt demands for the unexpired term of the leases. However, plaintiffs do not clearly state the amount of damages Intrax seeks.

In their opposition brief, plaintiffs state that "[a]t the present time, Plaintiffs have not sought incidental or consequential damages arising from the disruption of its business due to the imminent failure of the telecommunications equipment acknowledged by Lucent." Plaintiffs further state that they "seek a refund of the amounts it [*sic.*] paid for the lease and subsequent purchase of the equipment, and/or the cost to repair or replace the equipment to remedy the Y2K defect." Assertions in the briefing papers cannot substitute for averments in the pleadings. The Court will grant plaintiffs leave to amend the Complaint to conform the pleading to the standards of the Y2K Act.[2]

#### (ii) Material Defects

■ The Y2K Act requires that the complaint contain "specific information regarding the manifestation of the material defects and the facts supporting the conclusion that the defects are material." 15 U.S.C. § 6607(c). Defendants argue that because plaintiffs removed their Lucent products prior to January 1, 2000, they cannot say with certainty "that any features actually malfunctioned or were inoperable, thereby causing damage." This argument appears disingenuous. Defendants do not contest plaintiffs' allegations that Lucent informed them in 1998 and 1999 that the equipment was not Y2K compliant and that no free fix would be provided. *See* Complaint para. 31, 32.

---

**2.** Defendants argue that plaintiffs cannot reasonably claim that the entire cost of a new system is an appropriate measure of damage and that the Y2K Act is designed to prevent such "pie in the sky" calculations. The Court does not believe that it is appropriate to tell plaintiffs how to calculate their damages at this stage of the proceedings. Suffice it to say that so long as plaintiffs amend their complaint by clarifying the specific amount of their claim, as directed above, they will have satisfied the damages pleading requirement of the Act.

Certainly, the worst option at that point would have been for plaintiffs to do nothing and risk equipment malfunction or shut-down, and defendants would be expected to criticize plaintiffs for failing to mitigate their damages if they had taken that option. *See* 15 U.S.C. § 6608 (requiring plaintiffs to mitigate damages).

■ The Complaint alleges that in some instances Lucent informed plaintiffs how the defect would affect the performance of the product, and that in other instances Lucent told the customers that it did not even know how the products would perform because no testing had been done. *See* Complaint para. 31.

Specifically, MediMatch alleges that it was informed by Lucent that its system would fail when affixing date and time stamps to voice mail messages and that Lucent was not sure how this would affect the rest of the system. *Id.* para. 43. Similarly, Intrax was informed that the "Product will not perform some of the functions described in the Product's specifications and the documentation accompanying it related [sic.] the Product's handling of certain calendar dates;" Lucent also provided a detailed description of five particular "data usage outages." *Id.* para. 53. Lucent also informed Intrax that its voice mail system would not allow entry of years beyond 1999 on the standard interface screens, would reset itself to the year 1970 every night after December 31, 1999, that messages would be sorted in the wrong order, and that it would report the wrong date and day of the week. *Id.* para. 55.

The Court finds that plaintiffs have provided specific information as to how the Y2K defects would affect their equipment, and that plaintiffs have shown materiality by clearly describing the importance of the equipment to their particular business operations.

#### (iii) State of Mind

The only cause of action with a state of mind element is plaintiffs' claim under the New Jersey Consumer Fraud Act; therefore, the Court will address the Y2K Act pleading requirement for state of mind in Part VI.B., *infra.*

### 2. The Effect of New Jersey Law Regarding the "Entire Controversy" Doctrine

■ The contracts by which MediMatch and Intrax acquired their products expressly provide that New Jersey law will apply to any claims concerning the "construction, interpretation and performance" of those agreements. Defendants argue in their moving papers that New Jersey's "entire controversy" doctrine mandates that all claims and defenses arising out of a single controversy be unified in one action. Defendants also argue that all parties must be joined in that single action.

However, plaintiffs cite controlling authority stating that the entire controversy doctrine does not apply where the initial litigation has not been concluded, and that the doctrine does not require party joinder. In *Rycoline Prods., Inc. v. C & W Unlimited,* 109 F.3d 883, 889 (3d Cir.1997), the Third Circuit noted that there is a "close relation between the Entire Controversy Doctrine and traditional res judicata principles." Although the two doctrines are not identical, the court held that both require the same degree of finality, and that "the Entire Controversy Doctrine does not preclude the initiation of a second litigation before the first action has been concluded." *Id.; see also Paramount Aviation Corp. v. Agusta,* 178 F.3d 132, 135 n. 1 (3d Cir.1999); *Mitchell v. Procini,* 315 N.J.Super. 557, 719 A.2d 201, 205 (1998).

In reply, defendants do not contest plaintiffs' position, instead taking a fallback position that the Court has discretion to prevent "forum shopping," and to promote convenience, fairness, and judicial economy. Defendants note that Newcourt's action against Intrax in New Jersey was filed in November 1999, three months before Intrax was named as a plaintiff in the instant suit, and that Intrax made a strategic decision not to file a counter-

claim in New Jersey, preferring to have its claims heard by this Court. However, this Court believes that the meaning of the entire controversy doctrine as recently stated by the New Jersey Supreme Court and the Third Circuit governs here as well—i.e. since the New Jersey action is not yet concluded, there is no bar to Intrax pursuing its claims in this federal Court.[3]

Therefore, the Court does not find that the "entire controversy" doctrine bars it from entertaining the full breadth of plaintiffs' claims.

## B. PLAINTIFFS' FIRST CAUSE OF ACTION FOR VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

The New Jersey Consumer Fraud Act ("CFA") prohibits: "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise..." N.J.S.A. 56:8–2. Plaintiffs Medi-Match and Intrax, on their own behalf and on behalf of the putative class, allege that defendants have engaged in both affirmative acts and knowing omissions that violate the CFA.

### 1. Statute of Limitations

(a) The Parties' Contractual Agreement to a One Year Limitations Period

■ Defendants argue that plaintiffs contractually agreed to a one year statute of limitations on their CFA claims, by signing purchase agreements stating that "[n]o action or proceeding against AT & T or its affiliates or suppliers may be commenced more than twelve (12) months after the cause of action accrues." Plaintiffs contend that the statutory six year limitations period should apply.[4] In the Tentative Order, the Court stated that the recent appellate decision in *Mirra v. Holland America Line*, 331 N.J.Super. 86, 89, 751 A.2d 138, 139 (2000) appears to dispose of this question. In *Mirra*, the court held that the CFA does not bar parties from contracting to a limitation period shorter than that provided by law. *Id.*

At oral argument, plaintiffs' counsel took issue with the Court's tentative ruling by arguing that *Mirra* does not recognize the effect of agreements to shorten a limitation period when the agreement violates public policy. However, since fraud violates public policy by definition, plaintiffs' position would eviscerate the very rule so clearly announced in *Mirra*. Nonetheless, the Court recognizes that *Mirra* does create some room for exception to the shortened limitations rule. On the facts of that case, the court held that contracts with shortened limitations periods, made between a cruise line and its passengers, would not be recognized where they are "unreasonable or fundamentally unfair," and "where the terms of the contract are reasonably communicated." *Mirra v. Holland America Line*, 331 N.J.Super. 86, 91, 751 A.2d 138, 140 (2000). How the New Jersey courts would apply *Mirra* to the facts of the instant case is not entirely clear to this Court. The Court declines to

---

**3.** Defendant Newcourt also argues that the Court should exercise its discretion to dismiss Intrax's claims based on general principles of federal courts' deference to state courts over pendent state law claims. This argument was not raised in Newcourt's moving papers, and therefore will not be considered by the Court.

Lastly, in its Reply brief, Newcourt asks that if the claims by Intrax are not dismissed, they should be stayed pending resolution of the New Jersey action. Newcourt provides no authority or reasoning for such a stay. If

Newcourt is seriously interested in obtaining a stay, and if it has legal authority to support its position, it should present its position in a properly noticed motion.

**4.** MediMatch entered into its first sale and lease agreements with defendants in October 1993, and filed the original complaint in June 1999, close to six years later. Intrax entered into its first lease in May 1996, and was joined as a plaintiff in this action in January 2000, roughly three and a half years later.

take a final position with respect to the validity of the agreement to shorten the limitations period in this case, as the Court prefers not to provide its own interpretation of New Jersey law where the courts of that state have not spoken unequivocally. Since plaintiffs' fraud claim will survive the motion to dismiss even if a shortened limitations period applies, as discussed below with respect to the issue of accrual, interpretation of New Jersey law on this point is not necessary to the outcome of this motion.

Assuming now, for the sake of argument, that the agreed upon shortened limitation period applies, the question remains—when does 'accrual' occur? In the Tentative Order, the Court noted that the parties essentially agree that the applicable legal standard is that claims do not accrue until a party discovers, or by exercise of reasonable diligence should discover, the facts forming the basis of a claim. *See Keil v. National Westminster Bank,* 311 N.J.Super. 473, 710 A.2d 563, 571 (1998). At oral argument, however, counsel for Lucent stated that defendants do *not* agree that a discovery rule applies to the New Jersey CFA, and that defendants did not concede in their briefing that the discovery rule applies.

The actual wording of Lucent's reply brief unambiguously belies counsel's assertion. In the brief, defendant cited *Keil* and stated: "As Plaintiffs' own authority states, CFA claims accrue when 'by exercise of reasonable diligence and intelligence [plaintiffs] *should have discovered* facts which form the basis of a claim." *See* Defendant Lucent's Reply, filed June 12, 2000 [emphasis supplied by defendant]. At oral argument defense counsel also contended that the issue is controlled by *Dreier Co., Inc. v. Unitronix Corp.,* 218 N.J.Super. 260, 527 A.2d 875 (1986), which was never cited in defendants' papers, but which was cited by plaintiffs. Defense counsel argued that *Dreier* holds that accrual occurs on the date of the last fraudulent act, rather than the date of actual or constructive discovery. Counsel reads far more into *Dreier* than actually exists. In that case, the court posed the question: "[W]hen did plaintiff's cause of action under the Consumer Fraud Act accrue for purposes of the triggering of the one-year time bar?" *Id.* at 882, 527 A.2d 875. The court determined that fraudulent conduct extends beyond an initial transaction to all subsequent performance of the persons involved in the transaction. *Id.* The court then found that defendants' alleged fraudulent misrepresentations continued into the statute of limitations period, and, on that basis, denied defendants' motion for summary judgment. While it is true that the court did not acknowledge a discovery rule for the CFA claim, it did not need to (since the subsequent performance of the transaction occurred during the limitations period) and, it appears, the court was not even presented with the issue. Lucent is clearly overreaching in its attempt to turn the *Dreier* court's silence into a statement of New Jersey precedent on the discovery rule. In contrast, the cases cited by plaintiffs' counsel in their briefing hold up to scrutiny far better. For example, in *Southern Cross Overseas v. Wah Kwong Shipping,* 181 F.3d 410, 425 (3d Cir.1999), the Third Circuit held that a cause of action for fraud accrues under New Jersey law "when a plaintiff knows or should know of its existence," and that "when the gist of the action is fraud concealed from the plaintiff, the statute begins to run on discovery of the wrong or of facts that reasonably should lead the plaintiff to inquire into the fraud."

At oral argument, counsel for Lucent presented additional grounds for rejecting the discovery rule. Counsel argued that *Mirra v. Holland America Line, supra,* which allows the parties to agree to a shortened limitations period, stands for a policy that the parties should be allowed to bargain for certainty in their behavior, and that such policy would be thwarted by the application of the discovery rule. Regardless of whatever theoretical appeal that

argument may have, this federal district court in California is unwilling to stretch the bounds of its discretion so far as to declare the rules for applying the statute of limitations under New Jersey state law without a more explicit and specific ruling from the New Jersey courts themselves.[5]

Defense counsel also asked the Court at oral argument to look to the rule of this Court's "home state," which does not recognize the discovery rule under California's Unfair Competition Law (as discussed *infra*), as a basis for refusing to "engraft" such a rule on New Jersey. Again, counsel asks far too much. This Court will not stretch its discretion so far as to consider California's treatment of the issue in determining the law of the state of New Jersey.

█ Thus, having rejected defendants' numerous arguments against the discovery rule, the Court next applies the rule to the facts of this case. Plaintiffs argue that MediMatch did not discover the Y2K defect until September 1998, and that Intrax did not discover the defect until June 1999, when Lucent informed them that their systems were not Y2K compliant *See* First Amended Complaint, para. 43, 52–55. These dates are within one year of plaintiffs' respective filing dates.

While plaintiffs focus on the date of notification of the defect, they fail to address whether in the exercise of reasonable diligence they should have uncovered the defect earlier. Thus, defendants contend that where publicity and information is generally available, the court may impute knowledge to the plaintiffs. In that light, defendants argue that plaintiffs' own allegations of wide-spread knowledge of the Y2K problem suffice to hold plaintiffs to having been on notice. However, those allegations are mostly geared toward knowledge within the computer and technology industries, and cannot alone provide a basis for imputing knowledge to the plaintiffs.

At oral argument, defense counsel informed the Court that Lucent posted information regarding the Y2K defects on its web site on February 1, 1997, thereby putting plaintiffs on inquiry notice prior to the commencement of the limitations period. Defense counsel did not have evidence at oral argument to support his claim, though he offered to provide it to the Court in any manner deemed appropriate. Plaintiffs' counsel would not stipulate to the date the web site was posted, nor to the exact content of that posting. While the timing and substance of the web site posting may well be significant in the ultimate resolution of this case, the Court does not find it to be determinative at this stage of the proceedings. As discussed above, even assuming a detailed early posting of the Y2K defects, the Court cannot say as a matter of law that plaintiffs should have discovered the information on the web site through the exercise of reasonable diligence. As plaintiffs' counsel pointed out, these plaintiffs are not in the technology field and had no reason to be checking the web sites of the manufacturers of their office equipment.[6] While discovery may shed light on this issue for the purpose of a summary judgment motion, the Court does not find that defendants have established a basis for dismissal. At this stage of the proceedings, the Court is unable to find, as a matter of law, that plaintiffs should have been aware that their telephone equipment may have contained Y2K defects earlier than the dates upon which they were notified by Lucent.[7]

5. The *Mirra* decision itself is a short opinion with no discussion or mention of any underlying principles such as allowing parties to bargain for certainty.

6. The Court declines to rule as a matter of law, as defendants' counsel proposed at oral argument, that the web site posting was tanta-

mount to the traditional practice of national publication through the print media.

7. While statute of limitations questions are commonly decided as a matter of law, the matter becomes a mixed question of law and fact when resolution requires determining constructive notice. Since the factual ele-

Though the discussion above resolves the matter, the Court will briefly discuss plaintiffs' further arguments. Plaintiffs argue that the accrual of their claims was tolled by defendants' alleged fraud in failing to disclose the Y2K defects at the time of sale. Even if this were true, it does not mean that plaintiffs were not on constructive notice at some point following the sale, prior to their actual knowledge, and outside the one year limitations period. *See Simpson v. Widger,* 311 N.J.Super. 379, 709 A.2d 1366, 1373 (1998) (even where limitations period is tolled, "the period of limitations begins to run 'when plaintiff should have discovered the fraudulent scheme...'").

■ Plaintiffs further argue that their losses were not "ascertainable" within the meaning of the CFA, and that the limitations period therefore did not begin to run, until they replaced the equipment in 1999. Plaintiffs provide no authority for this argument. The CFA states that "[a]ny person who suffers any ascertainable loss of moneys or property ... may bring an action" for consumer fraud. *See* N.J. Stat. sec. 56:8–19. The "ascertainable loss" element of the statute clearly functions to place a specific limitation on damages. *See Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350 (1997). This damages provision does not alter the fact, as discussed above, that the statute of limitations begins to run when a party learns, or should have learned, of the facts forming the basis of a fraud claim.[8]

Plaintiff's additional argument that the statute of limitations on Intrax's claims was tolled by the filing of the case as a class action is similarly transparent. How could a named plaintiff whose claim is

time-barred be resurrected simply by designating the case as a class action? Plaintiff provides no explanation, and none exists. Furthermore, plaintiffs' citation to *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) does not help in the least. In *American Pipe,* the Supreme Court held that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *Id.* at 553, 94 S.Ct. 756. Plaintiffs may take note that the Supreme Court also stated that "statutory limitation periods are 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *Id.*[9]

### (b) The Uniform Commercial Code Limitations Period

■ Defendants argue in the alternative that the limitations rule for contractual sales and warranties under the Uniform Commercial Code ("UCC"), which has a four year period but which is triggered "when tender of delivery is made," bars plaintiff MediMatch's CFA claims. *See* N.J.S.A. sec. 12A:2–725; UCC sec. 2–725. Even if the UCC did apply, it would not bar plaintiff's claims, as discussed below.

The UCC provides:

(1) An action for breach of any contract for sale must be commenced within 4

---

ment of this question cannot be answered at this stage, the resolution of the matter must await discovery.

8. At oral argument, plaintiffs' counsel challenged the Court's position, but, since it is of no consequence to the outcome of this motion, preserved their argument in the event the issue becomes relevant at a later time.

9. At oral argument, plaintiffs' counsel stated that they were not attempting to resurrect any time-barred claims. The Court remains perplexed by plaintiffs' argument, but recognizes that again it is of no consequence to the outcome of this motion.

years after the cause of action has accrued.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made...

Defendants rely on *Dahlmann v. Sulcus Hospitality Tech. Corp.*, 63 F.Supp.2d 772 (E.D.Mich.1999), where plaintiffs bought a hotel reservations system that allegedly contained a Y2K defect. Addressing plaintiffs' breach of contract and breach of warranty claims, the court applied the UCC and held plaintiffs to a limitations period of four years from the date of purchase, "regardless of the time of discovery of the breach." *Id.* at 774. However, the court did not address the limitations issue to plaintiffs' claims for fraud and deceit. *Id.* at 776.

Plaintiffs point to *D'Angelo v. Miller Yacht Sale*, 261 N.J.Super. 683, 619 A.2d 689, 691 (1993), where the court applied the four year limitations period of the UCC to plaintiff's breach of warranty claims, but held that the UCC "saves from preemption common-law fraud and Consumer Fraud Act claims arising from a sales transaction" and that "[s]uch claims may be brought within six years of accrual." [10] Since the purchases here were made within six years of the respective filing of the original and amended complaints, and since this cause of action is based on fraud, there is no statute of limitations bar under the UCC.

### 2. Violation of the CFA by "Affirmative Acts"

#### (a) Lucent

■ Proceeding to the substantive elements of the Consumer Fraud Act claim, to prove that a defendant engaged in an "affirmative act" under the CFA, the defendant will be "liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 365 (1997). Not just any erroneous statement will suffice; rather, "[t]he misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Id.* at 366.[11]

■ The First Amended Complaint alleges that defendant Lucent marketed and sold defective equipment with the representation that the products would continue to work "well into the future," and that they would have "long-time functionality." *See* Complaint para. 30. The Complaint also quotes Lucent's promotional materials, which promote some of the components purchased by MediMatch as "the only communications system your business will ever need" which offer "unprecedented investment protection now and in the future." *Id.* para. 42. The same promotion implied that its products would be a wise investment in a field where "technology is constantly evolving." *Id.* In their briefing, plaintiffs characterize these promises by Lucent as follows: "The factual statements made by defendants AT & T and Lucent connoted long-term performance and value for the buyer," and "[t]he representations gave assurances to potential buyers on issues of substantial concern to them." On that basis, plaintiffs argue that Lucent's statements constitute material affirmative acts in violation of the CFA.

---

**10.** Defendants' citations to *D'Angelo*, as well as *Spring Motors Distrib., Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660, 663 (1985), and *Custom Communications Eng'g, Inc. v. E.F. Johnson Co.*, 269 N.J.Super. 531, 636 A.2d 80, 85 (App.Div.1993), are unavailing. In each of these cases the four year limitations period applied to breach of contract or warranty claims, not to fraud claims.

**11.** The Court rejects defendants' attempt to apply the heightened standard proposed by the concurring opinion of Justice Stein in *Chattin v. Cape May Greene*, 124 N.J. 520, 527, 591 A.2d 943 (1991), which was not adopted by the court in *Gennari* and which clearly does not represent the state of New Jersey law.

Defendants characterize these statements as mere "puffery." Construing the allegations liberally in the light most favorable to plaintiff, the Court finds that the statements of long-term performance could constitute material factual statements and that a jury could find them to be untrue. While there certainly is some puffery, the Court finds enough of a factual statement at the core of Lucent's representations to satisfy this element of the test for a claim under the CFA.[12]

#### (b) Newcourt

Defendant Newcourt notes that plaintiffs make no allegation that anyone from Newcourt made any statements of any kind about the equipment. Indeed, the specific promotional statements discussed above are attributed by plaintiffs exclusively to Lucent. Plaintiffs respond by arguing that Newcourt made misrepresentations about the "fair market value" of the equipment which were made to both Medi-Match and Intrax. However, the only reference in the Complaint to misrepresentations about the "fair market value" of the equipment is in regard to MediMatch's purchase of the equipment mid-way through its lease agreement. Intrax was always a lessor and never attempted to purchase the equipment, so the question of fair market value was not material to any transaction involving Intrax.

Thus, the Court finds that plaintiff Intrax has failed to allege any misstatement made to it by Newcourt. Plaintiff Intrax is granted leave to amend the complaint with facts sufficient to show a material misstatement by Newcourt.

#### 3. Violation of the CFA by "Knowing Omissions"

 The Consumer Fraud Act can be violated not only by an affirmative mis-

statement, but also by a knowing omission. "[W]hen the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud." *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 647 A.2d 454 (1994). Under Federal Rule of Civil Procedure 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Under the Y2K Act: "In any Y2K action in which a claim is asserted on which the plaintiff may prevail only on proof that the defendant acted with a particular state of mind, there shall be filed with the complaint, with respect to each element of that claim, a statement of the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 6608(d). Thus, for the purpose of proving fraud, Rule 9(b) and the Y2K Act operate in tandem, requiring that plaintiff must state the circumstances of the fraud with particularity, and must allege facts sufficient to create a strong inference that each defendant acted with an intent to defraud.

 Clearly, this is a rather high pleading standard. Focusing on the factually specific allegations in the Complaint, and ignoring the generalizations, plaintiffs allege the following:

(a) Since at least the early 1990's, defendants have known that the products in question would not function properly beyond December 31, 1999. *See* Complaint para. 20.

(b) Around 1988, various trade publications (two of which are named in the complaint) were published recognizing the

---

12. The other element of a claim under the CFA is that the misrepresentation was "made to induce the buyer to make the purchase." *See Gennari,* 691 A.2d at 366. This does not mean that plaintiff must have actually relied on the misstatements. Nor does it create an intent requirement. *Id.* Indeed, the function

of this clause is unclear. In *Gennari,* the court simply said that the inducement factor "does not require proof of reliance," but the court never said what it does require. This Court therefore does not find lack of inducement to be a basis for dismissal.

Y2K problem and advocating standards for a solution. Plaintiffs allege that defendants became aware of two of these, but no allegation of knowledge is made as to the remainder. *Id.* para. 21–23.

(c) In 1993, one of defendants' employees, a former director of software and systems research at AT & T Bell Laboratories, was quoted in *Business News* as saying that "I expect there will be some who aren't going to notice [the Y2K problem] until it happens....Almost always there's some fraction of people who don't hear about something or forget about it." *Id.* para. 24. The complaint does not indicate which defendant employed this individual. Plaintiffs do not provide any further facts indicating that defendants were aware of this article.

(d) Defendants' public filings show that they have been aware of the Y2K problem since at least "several years" prior to 1997.

(e) Lucent now advertises that its products introduced after September 1996 are Y2K compliant, thereby indicating that it "had knowledge of the Year 2000 problem long enough before September 1996 to do the research and development necessary to put new products on the market." *Id.* para. 26.

(f) Newcourt, "as the exclusive or preferred leasing agent" for Lucent, "had knowledge regarding the performance capabilities of [Lucent's] products." *Id.* para. 27.

(g) Newcourt had independent knowledge of the Y2K problem, as evidenced by a statement in its Annual Reports from 1993 to 1997, indicating that it monitored its equipment for "obsolescence trends." Plaintiffs conclude from this that "Newcourt actively sought to identify obsolescence trends such as the Year 2000 problem." *Id.* para. 28.

(h) In its Annual Report for 1997, Newcourt stated that it had begun addressing the Y2K issue in its prior incarnation as AT & T Capital Corp. *Id.* para. 29.

(i) MediMatch claims that Newcourt represented that the fair market value of the system at the time of purchase was $32,550.24, despite Newcourt's knowledge of a much lower actual value due to the Y2K defect. *Id.* para. 37–40.

(j) The Complaint incorporates by reference a portion of the Lucent web site that identifies its communications products and, for each one, its Y2K status (e.g. "Non-compliant," "No Year 2000 testing will be performed," "Compliant," "... expected to be non-compliant," etc.). *See* Complaint, Exh. 1. While a date of March 4, 1999 is affixed to the document, it is entirely unclear when the document was first produced.

Thus, despite some ambiguity of timing, it is apparent that plaintiffs have alleged that general knowledge of the Y2K problem was fairly widespread, and that defendants had specific knowledge of the defect, before the contracts herein were entered. The Court finds that plaintiffs have stated the circumstances of the fraud with sufficient particularity.

However, the question of whether the facts alleged suffice to create a strong inference that each defendant acted with an intent to defraud is a more difficult question. Plaintiffs rely on the fact of defendants' knowledge of the Y2K problem, and the fact that defendants sold or leased equipment that they knew may have been non-compliant, to create an inference of intent. Under general pleading rules, this would suffice to give defendants fair notice of the claim and the grounds upon which it is based. But under the Y2K Act, do these facts create a "strong inference" of intent to defraud, or do they suggest just a mere possibility?

The parties cite no cases addressing the "strong inference" pleading standard under the Y2K Act, and this Court's own research of all federal and state court decisions likewise has found no guidance. Looking to the intent of Congress, it is clear that at least one purpose in creating such a high pleading standard was to avoid

or reduce the potential disruption to commerce and potential flooding of the courts due to Y2K problems. It is equally clear, however, that Congress meant to "preserv[e] the ability of individuals and businesses that have suffered real injury to obtain complete relief." 15 U.S.C. §§ 6601(a)(3)(B) to 6601(a)(8), 6601(b)(4).

Defendants analogize the "strong inference" standard to the one applied in *In re Southern Pacific Funding Corp.*, 83 F.Supp.2d 1172, 1177–78 (D.Ore.1999). There, the court applied Federal Rule of Civil Procedure 10(b) in a securities action where the level of scienter required that the conduct "strongly suggest[ ] actual intent." The court further stated that the level of scienter increases as a function of any increase in the level of materiality of the facts. "Thus, while motive and opportunity are insufficient to give rise to a strong inference of scienter standing alone, motive and opportunity coupled with highly material misrepresentations or omissions may well satisfy the standard." *Id.*

▮ Balancing these competing considerations, the Court finds that plaintiffs have satisfied the heightened pleading requirement. Plaintiffs have pled specific facts indicating defendants' knowledge of an easily understood problem, that defendants continued to sell their products without warning of their potentially limited life-spans, that defendants' knowledge and actions were highly material to plaintiffs' alleged injuries, and that plaintiffs and other customers were in fact injured by their acquisition of these products. A reasonable person could find that this sequence of events creates a strong inference of an intent to defraud.

### 4. The Hold Harmless Provisions of MediMatch's Lease with Newcourt

▮ MediMatch's lease agreement with Newcourt contains an express indemnification and hold harmless provision, as follows:

Lessee shall ... hold harmless, and ... defend Lessor against all claims ... [including] matters regarding ... the selection, manufacture, purchase, acceptance, rejection, ownership, deliver, lease, possession, maintenance, use, condition, return or operation of the Equipment; [and] (b) any latent defects or other defects in the Equipment, whether or not discoverable by Lessor or by Lessee...

Plaintiffs argue that even an express hold harmless provision cannot protect against a claim of fraud or other intentional misconduct. Plaintiffs' only support for this position is California statutory and case law. However, plaintiffs concede that the agreement contains an effective choice of law provision whereby the parties selected New Jersey law. Plaintiffs fail to cite any New Jersey authority that supports its position. At oral argument, plaintiffs' counsel argued that a general nationwide policy exists to protect consumers against unconscionable agreements, and that the absence of New Jersey precedent on this point does not mean that the New Jersey courts would not accept this principle. In support of this position, plaintiffs cite *Ambassador Ins. Co. v. Montes*, 76 N.J. 477, 388 A.2d 603, 606 (1978). It is true, as plaintiffs contend, that in *Ambassador* the court applied the principle that indemnifying a party against the consequences of its own intentional wrongdoing is contrary to public policy. However, the actual holding of the *Ambassador* court is far more limited—it is that an insurance company's indemnification of a person for loss incurred as a result of his or her wilful wrongdoing in violation of a criminal statute is contrary to public policy. *Id.* Even then, the court held, this principle is not to be applied in all circumstances. *Id.* Thus, the fact remains that the New Jersey courts have not expressed a clear and precise enough position on the question of whether a corporate defendant can rely upon a hold harmless agreement to escape liability for its own fraudulent conduct, and this Court

remains unwilling to take such a position for them.

Plaintiffs' backup position is that if there is a conflict between New Jersey and California law on this point, the Court should decline to apply New Jersey-law as contrary to California's fundamental public policy. *See Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992). Plaintiff's position is baffling. Plaintiffs have chosen to be in federal court, which happens to be located in the State of California, have filed a claim for violation of a New Jersey statute, and have contractually agreed to the application of New Jersey law. There is no conceivable scenario in which this Court could apply California law to the instant claim.

## C. PLAINTIFFS' SECOND CAUSE OF ACTION FOR BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY

Plaintiff Intrax claims that defendant Lucent breached implied warranties of merchantability and fitness for a particular purpose under New Jersey law.[13]

### 1. Statute of Limitations

■ Plaintiff Intrax also attempts to get around the one year limitation period to which it contractually agreed, by arguing that the limitations period should have been tolled due to defendants' fraudulent concealment of the Y2K defects at the time of sale. While the UCC, as adopted by New Jersey law, allows the parties to adopt a shorter limitations period, it also allows for tolling of those shorter periods. *See* U.C.C. § 2–725(4); NJSA sec. 12A:2–725(4). Accordingly, the doctrine of fraudulent concealment may be applied to toll the statute of limitations on Intrax's breach of implied warranty claim. *See Zurn Constructors, Inc. v. B.F. Goodrich*

*Co.,* 746 F.Supp. 1051, 1055 (D.Kan.1990); *Simpson v. Widger,* 311 N.J.Super. 379, 709 A.2d 1366, 1373 (1998). Plaintiffs have sufficiently alleged that defendants fraudulently concealed the Y2K defects in their products in order to satisfy their obligations at this stage of the proceedings.

### 2. Plaintiff Intrax Agreed to a Disclaimer of All Warranties

■ On the merits of this cause of action, defendants contend that the implied warranty claim is barred by a disclaimer of those warranties contained in the purchase contract. The disclaimer is contained two-thirds of the way through a single page document titled "Terms and Conditions," and is written in upper-case type—in the same font size as the rest of the document, and without boldfacing, italics, or other special typeface—as follows:

AT & T AND ITS AFFILIATES AND SUPPLIERS MAKE NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIM ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.[14]

*See* Wiessler Decl., Exh. C, para. 13.

The Uniform Commercial Code, as adopted by New Jersey, specifically authorizes parties to waive these warranties, so long as the waiver is "in writing and conspicuous." *See* N.J. Stat. Ann. § 12A:2–316(2). The Code states:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals ... is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.

---

**13.** This cause of action is asserted by Intrax on its own behalf and on behalf of the putative class, but not by MediMatch. It is asserted against Lucent, but not Newcourt.

**14.** Intrax signed a similar disclaimer in its lease agreement with Newcourt, where the relevant provision is in all capitals and boldfaced. Intrax does not claim liability against Newcourt on this cause of action.

The Code further provides that "the court" shall determine whether a term or clause is "conspicuous." *See* N.J. Stat. Ann. § 12A:1–201(10); *see also Sierra Diesel Injection Service, Inc. v. Burroughs Corp., Inc.,* 890 F.2d 108, 114 (9th Cir.1989). In making this determination, the Court must review the conspicuousness of the disclaimer in the context of the entire contract, and in light of the sophistication of the parties. *See Sierra Diesel,* 890 F.2d at 115. There is no mechanistic test that will apply to all cases. *Id.*

In *Sierra Diesel,* where the same U.C.C. provision applied, the Ninth Circuit affirmed a district court ruling that a disclaimer on the back of a contract, written in 7–point capital letters, but not in bold face type, where the buyer was unsophisticated, was insufficiently conspicuous to be given effect. *Id.* In the course of its analysis, the *Sierra* court examined two Nevada Supreme Court decisions involving sophisticated parties where similar disclaimers *were* given effect. The *Sierra* court concluded that "a disclaimer in capital letters that mentions merchantability can be effective to exclude warranties," although disclaimers in "capital letters as a matter of law will [not] be effective in all cases." *Id.* at 115.

Having reviewed the disclaimer at issue in the instant case, and considering the sophistication of the parties, the Court finds that the disclaimer is effective as a matter of law.

 Plaintiffs' back-up argument is that even if the disclaimer is enforceable, it was contained only in the first of six agreements between Intrax and defendants. Therefore, plaintiffs argue that at a mini-

mum Intrax's claim for breach of implied warranties cannot be barred as to the final five contracts (which were all lease agreements with Newcourt and not specifically with Lucent). Defendants respond by pointing to another provision of the original contract which provides that the terms and conditions of that agreement govern "any subsequent oral or written Customer order for Products or Services accepted by [Lucent]." *See* Wiessler Decl., Exh. C, para. 13.

Plaintiffs argue that Intrax's subsequent leases of additional equipment through Newcourt cannot bind plaintiffs to any disclaimers by Lucent. Defendants counter by arguing that the original agreement covers "any" subsequent order for Lucent products without limitation as to the entity acting as the seller or lessor.[15]

The Court finds that the language of the original agreement controls. That language quite clearly states that the waiver provision covers any subsequent order for products accepted by Lucent. Clearly, all of the subsequently leased equipment was manufactured by Lucent. The fact that it was leased rather than purchased directly is immaterial. The Court also notes that the subsequent lease agreements with Newcourt are rather simple and informal one page letters, from which a reasonable lessee could infer that the more extensive and detailed Terms and Conditions that were previously agreed upon would remain in effect as the lessee continued to lease and/or purchase additional related equipment. *See* Defendant Newcourt's Request for Judicial Notice, Exh. B (letters from AT & T Credit [Newcourt] to Intrax dated 5/7/97, 5/23/97, 6/13/97, and 8/15/97).

---

**15.** Plaintiff cites *Spring Motors Distrib., Inc. v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660, 663 (1985), where plaintiff, a commercial truck buyer, purchased a truck manufactured by Ford which contained a transmission produced by a remote supplier. The issue of waiver was not presented in that case. Rather, the question was whether an express warranty from the manufacturer and/or dealer would apply to a remote parts supplier. The court held that a buyer need not establish privity with a remote supplier in a "distributive chain" to maintain an action for breach of warranty. *Id.* However, *Spring Motors* is inapposite. The question here is not whether plaintiffs could maintain a breach of warranty action against a remote entity, but rather it is whether an agreement to waive such an action carries through to subsequent lease agreements for the manufacturer's products.

Since there are no additional facts that could be pled and that would be material to this issue, plaintiffs' cause of action for breach of implied warranty of merchantability and fitness for a particular purpose is thereby dismissed with prejudice.

### D. PLAINTIFFS' THIRD CAUSE OF ACTION FOR FRAUDULENT AND UNFAIR BUSINESS PRACTICES

Plaintiffs MediMatch and Intrax, on their own behalf and on behalf of the putative class, assert a claim for violation of California's Unfair Competition Law ("UCL"). *See* Cal. Bus. & Prof.Code § 17200, *et seq.* The UCL prohibits any "unlawful, unfair or fraudulent" business acts or practices.

#### 1. Statute of Limitations

 Defendants contend that a four year statute of limitations applies to plaintiffs' claims under the California Unfair Competition Law ("UCL"), Cal.Bus. & Prof.Code § 17200 *et seq.*, thereby barring MediMatch's claim. In particular, the Code provides that "[a]ny action to enforce any cause of action [for unfair competition] shall be commenced within four years after the cause of action accrued." *Id.* § 17208; *see also O'Connor v. Boeing North American, Inc.*, 92 F.Supp.2d 1026, 1053 (C.D.Cal.2000).

Plaintiff MediMatch does not contest that under the standard rule its claims would be barred. Rather plaintiff responds by arguing that under California's "discovery rule," applicable statutes of limitation are tolled until a plaintiff knows or should know of the basis for the claim. *See Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110–11, 245 Cal.Rptr. 658, 751 P.2d 923 (1988). However, in their opening and reply papers, defendants cite *Stutz Motor*

*Car of America, Inc. v. Reebok Int'l, Ltd.*, 909 F.Supp. 1353, 1363 (C.D.Cal.1995), for the proposition that the discovery rule does not apply to UCL claims. In particular, the court in *Stutz* held that "the 'discovery rule' ... is inapplicable on [the unfair competition claim]; thus, the statute begins to run when [the] cause of action accrues, irrespective of whether plaintiff knew of its accrual..." *Id.* at 1363.[16] This holding was reaffirmed in *O'Connor v. Boeing North American, Inc.*, 92 F.Supp.2d 1026, 1053 n. 52 ("as to the unfair business practices claim, the discovery rule would not have applied"). Plaintiffs fail to address *Stutz* or *O'Connor* whatsoever. Since it is clear from the face of the First Amended Complaint that the UCL cause of action accrued for MediMatch more than four years prior to the date of filing, MediMatch's claim is time-barred.[17]

#### 2. The Parties' Agreement that New Jersey Law Govern All Claims

Proceeding to the merits of the claim, the Court begins with the fact that plaintiffs' purchase agreements contain an express choice-of-law provision that the "construction, interpretation and performance of this Agreement shall be governed by the local laws of the State of New Jersey." Plaintiffs concede that New Jersey law applies, with the caveat that "should the Court find that Plaintiffs have no remedy under New Jersey law, Plaintiffs should be free to pursue their claim under [the California UCL]."

 Plaintiffs' position is clearly untenable, and defendants correctly label it a "heads I win, tails you lose" argument. Under California law, a choice of law made by sophisticated commercial parties through arms length negotiation will be enforced unless the chosen law conflicts

---

**16.** Defendants also argue that the California Code of Civil Procedure, § 338, limits the discovery rule to the provisions contained therein, thereby excluding § 17200 from coverage. However, the Court finds no mention of such limitation in § 338.

**17.** Defendants do not contest that plaintiff Intrax filed its UCL claim within four years of accrual; therefore, Intrax's claim is not time-barred.

with a fundamental public policy of California. *See Nedlloyd Lines, B.V. v. Superior Court,* 3 Cal.4th 459, 465–66, 11 Cal. Rptr.2d 330, 834 P.2d 1148 (1992). The mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law. *See Wong v. Tenneco,* 39 Cal.3d 126, 135–36, 216 Cal. Rptr. 412, 702 P.2d 570 (1985) (the standard is whether the chosen law is so offensive to California public policy as to be "prejudicial to recognized standards of morality and to the general interest of the citizens"). Plaintiffs cannot, and do not, argue that New Jersey consumer protection law, if applied in California, would violate the state's public policy toward consumers. Indeed, plaintiffs' note in their briefing that the New Jersey CFA "is intended to be 'one of the strongest consumer protection laws in the nation.' " [18]

■ Because the law is so clearly in favor of enforcing the choice-of-law provisions of the contracts, the Court will not address the purely hypothetical question of whether plaintiffs have alleged sufficient facts to meet the pleading standard for the UCL. Thus, plaintiffs' California UCL claims are dismissed with prejudice.

### E. DEFENDANTS' REQUEST FOR PROTECTIVE ORDER TO STAY ALL DISCOVERY

Defendant Lucent filed concurrently with its motion to dismiss a motion for a protective order to stay all discovery until thirty days after the earlier of (a) the Court's determination that plaintiffs have stated a viable cause of action or (b) defendants' filing of an answer (which they have not filed as of this date).[19]

The Y2K Act has a discovery stay option which defendants selected, and which was in effect until April or May 2000 (the exact date is disputed by the parties, but is no longer relevant since it has expired). 15 U.S.C. § 6606(e) & (f). Nonetheless, plaintiffs served discovery requests in February 2000, on the basis that the Y2K Act does not apply to plaintiff MediMatch. Defendants refused to make substantive responses, based upon the stay then in effect.

Much of the argument of the parties assumes that the motion for stay would be decided well before the motion to dismiss. Given the scheduling delays that have occurred, for which no party is at fault, and given that neither party requested consideration of the stay motion, that assumption has been proved wrong, thereby making the motion practically moot, as counsel for both parties recognized at oral argument. Since the Court is denying the motion to dismiss in part, and allowing leave to amend in part, as discussed *supra,* it is clear that discovery should now proceed *post haste,* and the motion is thereby denied.[20] Any outstanding written discovery requests should be answered within thirty (30) days of the filing of this Order, and any persons for whom deposition notices have been served should be identified within ten (10) days of the filing of this Order and produced as soon thereafter as

---

**18.** Plaintiffs' appreciation of the protection afforded to consumers under New Jersey law is further exhibited by their position that defendants' have locked themselves into applying New Jersey consumer protection law for the nationwide class, thereby leaving the unwritten implication that the contracts give heightened protection to class members from states without such protective laws.

**19.** Defendant Newcourt filed a Notice of Joinder in Lucent's motion for a protective order, but did not file separate briefing.

**20.** The Court notes that defendant's motion fails to provide good cause for the Court to exercise its discretion to grant a stay; the mere fact that the parties would incur expense prior to the Court's ruling on the motion to dismiss is insufficient as a basis for good cause. *See Gray v. First Winthrop Corp.,* 133 F.R.D. 39, 40 (N.D.Cal.1990).

reasonably possible. The parties are free to adjust this discovery timeline by joint stipulation. Any disagreements as to the outstanding discovery or future discovery that cannot be resolved informally should be addressed to the Court by noticed motion.

### F. DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendant Newcourt requests that the Court take judicial notice of the lease agreements between itself and MediMatch and Intrax, respectively. As these documents are referenced in the Complaint, the Court will grant this aspect of the request. *See Branch,* 14 F.3d at 454 ("documents whose contents are alleged in a complaint and whose authenticity no party questions, may be considered"); *Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998). Newcourt also asks the Court to take judicial notice of its Complaint against Intrax filed in the Superior Court of New Jersey, and Intrax's Answer to that complaint. Since these documents pertain to Newcourt's defense that the dispute between these two parties should be considered exclusively by the New Jersey courts, this Court will grant this aspect of the request as well.

Defendant Lucent requests that the Court take judicial notice of certain facts relating to the documents discussed above regarding the New Jersey action. The Court will take judicial notice of the documents themselves and the dates upon which they were filed. As the documents speak for themselves, the Court need not take judicial notice of the remaining facts asserted in Lucent's request, especially since those facts are insufficiently specific to warrant judicial notice (for example, the Court will not take notice of the broad statement that the "equipment at issue" in both actions is "the same," without any specification from Lucent as to exactly what the equipment is or where in the documents that specification is found).[21]

### CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED, as follows:

A. Defendants' motion to dismiss Plaintiffs' First Cause of Action for violation of New Jersey Consumer Fraud Act is GRANTED in part and DENIED in part as follows:

(i) The motion is DENIED with respect to MediMatch's claim against Lucent;

(ii) The motion is GRANTED with respect to MediMatch's claim against Newcourt, based on the contractual "hold harmless" agreement; this claim is hereby DISMISSED WITH PREJUDICE;

(iii) The motion is DENIED with respect to Intrax's claims against both defendants, under the theory of "knowing omissions;"

(iv) Intrax has failed to allege facts sufficient to support its claim under the theory of "affirmative acts;" if Intrax wishes to pursue that theory, it is granted LEAVE TO AMEND.

B. Defendants' motion to dismiss plaintiffs' Second cause of action for Breach of Implied Warranties of Merchantability is GRANTED.

C. Defendants' motion to dismiss plaintiffs' Third cause of action for violation of California's Unfair Competition Law is GRANTED.

D. Defendants' motion to dismiss for failure to comply with Y2K Act is GRANTED in part with LEAVE TO AMEND,

---

**21.** On July 17th plaintiffs filed a last-minute notice of a recent unpublished decision of a West Virginia state appellate court in *Community Health Assoc., et al. v. Lucent Technologies, Inc., et al.,* where the court denied defendants' motion to dismiss. The factual allegations and legal arguments are similar in many respects to the instant case. The analysis and recommendations above are consistent with those of the West Virginia court.

with respect to the specification of damages.

**E.** Defendants' motion for a protective order to stay discovery is DENIED.

**F.** Defendant Newcourt's request for judicial notice is GRANTED; Defendant Lucent's request for judicial notice is DENIED.

**IT IS SO ORDERED.**